Nancy L. **MILLER**, Plaintiff,

v.

**ALUMINUM COMPANY OF AMERICA**, Defendant.

**Civ. A. No. 84–2856.**

United States District Court, W.D. Pennsylvania.

Feb. 8, 1988.

Helen R. Kotler, Pittsburgh, Pa., for plaintiff.

Marlene W. Jackson, Linda M. Fratto, Pittsburgh, Pa., for defendant.

OPINION

DIAMOND, District Judge.

Before us is defendant's motion for summary judgment. For the following reasons, we will grant defendant's motion.

*Background*

Plaintiff, Nancy Miller, is a former employee of defendant, Aluminum Company of America ("Alcoa"). Miller sued Alcoa for several alleged violations of federal and Pennsylvania law arising out of their employment relationship. Since both parties reside in Pennsylvania, our jurisdiction over the state claims is pendent.

From the pretrial stipulation, we cull the following undisputed outline of the relevant actors and relevant events.

In 1980, the plaintiff, Nancy L. Miller, was employed as a unit supervisor at Alcoa's Logans Ferry facility in Pennsylvania. From December, 1981, through November, 1983, Thomas Plantin was the manager of this plant. In December of 1981 or January of 1982, Miller was demoted from unit supervisor to product technician. She took a $200 per month pay cut. Nearly a year later, on December 1, 1982, Joseph Crognali was promoted to the position of unit supervisor. Miller never filed charges with the EEOC regarding her demotion.

When Miller became a product technician, there was only one other, Mary Hollihan. Hollihan and Plantin began dating around November, 1981, and began to live together sometime in early 1983. Joseph Caylor, the lab supervisor, was the direct

supervisor for Miller and Hollihan. Caylor reported to Phillip Helsley, the manager of the quality assurance department. Helsley reported to Plantin.

Early in 1983, as part of its cost-cutting measures, Alcoa's Logans Ferry management decided to reduce its salaried work force by one product technician. On or around September 8, 1983, Miller was informed that she would be terminated on December 31, 1983, due to her poor performance. Consequently, Miller filed a charge of sexual discrimination on October 12, 1983. On November 7, 1983, her supervisors told her no longer to report to work. Nonetheless, she received her full salary until December 31, 1983. On November 8, 1983, Miller filed an additional EEOC charge of unlawful retaliation.

Joseph Crognali, who had been a unit supervisor, filled the product technician position from November 7, 1983, through December 12, 1983. His pay remained the same as it was when he was a unit supervisor—higher than Miller's as a product technician. On December 12, 1983, Crognali returned to a unit supervisor position.

In her amended complaint, Miller alleges violations of Title VII, 42 U.S.C. § 2000e–2. Miller claims that sex discrimination motivated her January 1, 1982, demotion from unit supervisor to product technician and the placement of a male, Joseph Crognali in that position on December 1, 1982. According to Miller, during her subsequent term as a product technician, her supervisors discriminated against her on the basis of sex by showing favoritism toward the other product technician, Mary Hollihan, because Hollihan was having an affair with the plant manager, Thomas Plantin.

Miller's Title VII claim also includes a retaliation aspect. 42 U.S.C. § 2000e–3. On September 8, 1983, Miller was told that she would be terminated in December, 1983, for poor performance. Miller alleges that because of her filing of a charge of sex discrimination with the EEOC on October 12, 1983, Alcoa discharged her early, on November 7, 1980.

During the time from November 7, 1983, until the end of December, Joseph Crognali received higher pay as a product technician than Miller had. Miller asserts that this pay discrepancy violates the Equal Pay Act, 29 U.S.C. § 206.

As to her state law claims, Miller founds her breach of contract claim on an employee handbook, the "Performance Appraisal System." Miller argues that this handbook modified her employment contract so that she could not be discharged absent proper appraisals of her performance. Miller also alleges that the harassment and favoritism she experienced while a product technician constitutes negligent and intentional infliction of emotional distress.

We will discuss the arguments and evidence bearing on summary judgment as to each claim separately.

### Discussion

We may enter summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether there exists a genuine issue of material fact, we must resolve all conflicts in the evidence and draw all reasonable inferences in the nonmovant's favor. *Baker v. Lukens Steel Co.*, 793 F.2d 509, 511 (3d Cir.1986). However, the non-movant may not rest on the allegations of her complaint. Once the movant indicates the absence of genuine issues of material fact, the non-movant, if she bears the burden of proof, is obligated to come forward with evidentiary materials of record sufficient to survive a motion for directed verdict. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 896 (3d Cir.1987) (en banc).

### I. The 1982 Demotion.

Miller claims that her demotion on January 1, 1982, from unit supervisor violated Title VII, because its motive was sexual animus. As evidence of this, Miller relies

upon the placement of Joseph Crognali, a less experienced male, in the unit supervisor position on December 1, 1982.

Alcoa argues that this claim is time-barred. Miller never filed an administrative complaint with the EEOC regarding this claim, as required by 42 U.S.C. § 2000e–5(e). In response, Miller contends that her demotion was part of a continuing violation of Title VII which culminated in her termination on December 31, 1983. Since Miller filed a timely EEOC complaint for her termination, that filing would encompass her 1982 demotion claim. The continuing violation consisted of a pattern and practice of discriminating against women and favoring women who proffered sexual favors to Thomas Plantin, the plant manager. To support this claim, Miller presents evidence that Plantin had an affair with another co-worker besides Mary Hollihan several years before November, 1981, *see* Pretrial Stip., III. 28, 29; Miller Aff., para. 27, and of the percentage of the employees at Alcoa's Logans Ferry Works that were women. Plaintiff's Exhibit K.

Miller also seeks to invoke the doctrine of equitable tolling. Alcoa informed her that her demotion was due to poor performance, thus, according to Miller, actively misleading her as to the accrual of her cause of action. Miller did not become aware that Alcoa's actions were discriminatory until her final termination and replacement by Crognali. Plaintiff's Brief in Response to Defendant's Motion for Summary Judgment, p. 4.

■ Timely filing with the EEOC is a prerequisite to maintenance of a Title VII action. *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 47, 94 S.Ct. 1011, 1019, 39 L.Ed.2d 147 (1974). The continuing violation theory measures the start of Title VII's limitations period from the time of the last of a series of related discriminatory acts. *See Bronze Shields, Inc. v. New Jersey Dep't. of Civil Service*, 667 F.2d 1074, 1081 (3d Cir.1981). The courts have emphasized that only a policy of discrimination can constitute a continuing violation:

> To prevail on a continuing violation theory, however, the plaintiff must show

more than the occurrence of isolated or sporadic acts of intentional discrimination. The preponderance of the evidence must establish that some form of intentional discrimination against the class of which plaintiff was a member was the company's "standard operating procedure."

*Jewett v. International Telephone and Telegraph Corp.*, 653 F.2d 89, 91–92 (3d Cir.1981). To prove this "standard operating procedure," plaintiff must show "a series of related acts, one or more of which falls within the limitations period, or the maintenance of a discriminatory system both before and during the [limitations] period." *Milton v. Weinberger*, 645 F.2d 1070, 1075 (D.C.Cir.1981), *quoting* Schlei & Grossman, EMPLOYMENT DISCRIMINATION LAW 232 (Supp.1979). The persistent effects of an isolated discriminatory act do not constitute a continuing violation. *United Air Lines v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977).

■ Resolving all inferences and doubts in Miller's favor, we still do not find a triable issue of a continuing violation. Miller's raw numbers showing the percentage of women in Alcoa's workforce are meaningless without comparison to "the community from which employees are hired." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 339 n. 20, 97 S.Ct. 1843, 1856 n. 20, 52 L.Ed.2d 396 (1977); *Mazus v. Department of Transportation*, 629 F.2d 870, 875 (3d Cir.1980). In *Mazus*, the Court of Appeals found that data showing that only .41% to .68% of highway maintenance workers were women did not make out a prima facie case of sex discrimination. The failure of plaintiff's proof lay in the absence of any data on the number of women applicants to this position. Similarly, Miller has not offered any data on the number of female applicants for employment at Alcoa's Logans Ferry Works.

■ Miller's 1982 demotion and her 1983 firing were two isolated and unrelated acts. Plantin was somehow involved in each firing and Plantin had twice, according to Miller, had affairs with female Alcoa em-

ployees. But two transgressions do not a pattern make. *See Sedima S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985). Plantin's first affair took place in Lafayette, Indiana. Plantin Depo. 61. Neither that affair nor his later affair with Mary Hollihan bore any relation to Miller's 1982 demotion. Both affairs were consensual; there is no evidence that Plantin had a practice of extracting sexual favors from female workers in exchange for employment benefits. At best, Miller alleges two separate discriminatory acts against the same employee with the same general discriminatory motive. This does not make out a continuing violation. *Stoller v. Marsh,* 682 F.2d 971, 975 (D.C.Cir.1982).

■ Title VII's time limits are subject to equitable tolling. *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982). "Plaintiffs have the burden of establishing the facts necessary to justify equitable tolling." *Byers v. Follmer Trucking Co.,* 763 F.2d 599, 600–601 (3d Cir.1985). The United States Court of Appeals for the Third Circuit has recognized equitable tolling where the defendant "has actively misled the plaintiff regarding the cause of action." *Meyer v. Riegel Products Corp.,* 720 F.2d 303, 307 (3d Cir. 1983). The plaintiff must reasonably rely on the misrepresentations to invoke the doctrine. *English v. Pabst Brewing Co.,* 828 F.2d 1047, 1049 (4th Cir.1987).

Additionally, some courts have imported a discovery rule into Title VII's time requirements. *See, e.g., Tucker v. United Parcel Service,* 657 F.2d 724 (5th Cir.1981); *Bey v. Schneider Sheet Metal, Inc.,* 596 F.Supp. 319, 322 (W.D.Pa.1984). Under this theory, the filing period does not begin to run "until the facts that would support a charge of discrimination under Title VII were apparent or should have been apparent to a person with a reasonably prudent regard for his rights similarly situated to the plaintiff." *Tucker,* 657 F.2d at 726. The Third Circuit Court of Appeals has not yet embraced the discovery rule in a holding; to the contrary, it has observed that

the restrictions on equitable tolling "must be scrupulously observed." *School District of City of Allentown v. Marshall,* 657 F.2d 16, 19–20 (3d Cir.1981); *but cf. Hart v. J.T. Baker Chemical Corp.,* 598 F.2d 829, 834 (3d Cir.1979) (assumes discovery rule applies, but upholds dismissal because plaintiff should have known her dismissal was discriminatory). Under both theories, the tolling period ends when plaintiff learns, or ought to learn, that she has been the victim of discrimination, and she has 300 days from that date to file with the EEOC. *See Wislocki–Goin v. Mears,* 831 F.2d 1374, 1381 (7th Cir.1987); *Bey v. Schneider Sheetmetal, Inc.,* 603 F.Supp. 450, 452 (W.D.Pa.1985); 42 U.S.C. § 2000e–5(e).

■ The facts, viewed most favorably to Ms. Miller, do not support either of these equitable tolling doctrines. Miller alleges that her supervisors informed her that her January 1, 1982, demotion was due to poor performance. Miller Aff., para. 6. Prior to this, however, Miller had been told that her performance was good. Miller Aff., para. 2, 5. On December 1, 1982, Joseph Crognali, a less-qualified male, filled her former position as unit supervisor. Miller Aff., para. 3, 4. These are the facts in their entirety that support Miller's claim of sexual discrimination in her demotion. Thus, the facts on which Miller relies to support her charge of discrimination in her demotion were apparent to her on December 1, 1982. Certainly, by December 3, 1984, when she filed her complaint in this court, Miller realized she had been the victim of what she perceived to be sexual discrimination. Yet, to this day, she has not filed a claim with the EEOC regarding her 1982 demotion.

## II. The Title VII "Paramour" Claim.

Miller claims that during her employment as a product technician her supervisor, Joseph Caylor, treated her less favorably than the other product technician, Mary Hollihan, because Caylor knew that Hollihan had a romantic relationship with

the plant manager, Thomas Plantin.[1] Miller does not assert, and nothing in the record indicates, that any of her supervisors conditioned employment benefits on her submission to his sexual advances. *See Craig v. Y & Y Snacks, Inc.,* 721 F.2d 77 (3d Cir.1983); 29 C.F.R. § 1604.11(g).

■ As a matter of law, these assertions do not state a Title VII claim. We follow the Court of Appeals for the Second Circuit in holding that preferential treatment on the basis of a consensual romantic relationship between a supervisor and an employee is not gender-based discrimination. *DeCintio v. Westchester County Medical Center,* 807 F.2d 304 (2d Cir.1986), *cert. denied,* — U.S. ——, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987); *see Autry v. North Carolina Dep't of Human Resources,* 820 F.2d 1384, 1386–87 (4th Cir.1987) (following *DeCintio* ). *DeCintio* is consistent with the holding of the United States Court of Appeals for the Third Circuit in *Bellisimo v. Westinghouse Electric Corp.,* 764 F.2d 175 (3d Cir.1985), that a plaintiff must show that her employer would have or did treat males differently to make out a Title VII claim. Male employees in Ms. Miller's workplace shared with her the same disadvantage relative to Ms. Hollihan: none could claim the special place in Mr. Plantin's heart that Ms. Hollihan occupied. Favoritism and unfair treatment, unless based on a prohibited classification, do not violate Title VII. *See Bellisimo,* 764 F.2d at 182; *Henson v. City of Dundee,* 682 F.2d 897, 904 (11th Cir.1982) (bisexual supervisor's sexual harassment of male and female alike would not violate Title VII; dicta); *Loeb v. Textron, Inc.,* 600 F.2d 1003, 1012 n. 6 (1st Cir.1979). Because they underestimate the essential element of disparate treatment based on gender, we reject those cases cited by Miller which permit "paramour" claims. *See King v. Palmer,* 598 F.Supp. 65 (D.C. 1984), *rev'd on other grounds,* 778 F.2d 878 (D.C.Cir.1985); *Kersul v. Skulls Angels, Inc.,* 130 Misc.2d 345, 495 N.Y.S.2d 886 (N.Y.Sup.Ct.1985).

### III. Hostile Work Environment.

Miller's allegation of a Title VII "hostile work environment" arises from a cumulation of purportedly harassing and distressing incidents. Her supervisor, Joseph Caylor, unjustly criticized Miller's work, while exempting Hollihan from any criticism because of Hollihan's relationship with Plantin. Miller Aff., paras. 21–23. Caylor assigned Miller menial and routine jobs. *Id.* at 22–23; Miller Deposition 139. Twice, Miller confided in Hollihan, and Hollihan betrayed these confidences to Plantin. One time, Plantin teased Miller about who she was dating. Miller Aff., para. 22. On another occasion, Miller's betrayed confidences resulted in an embarrassing remark by Plantin about her breasts. *Id.* at 24. Miller asserts that, in general, the favoritism shown Hollihan and Plantin's "flaunting" of his relationship with Hollihan distressed Miller. Finally, around the time of her discharge, Miller's co-workers and supervisors began to snub her, even failing to invite her to a birthday party. Miller Aff., paras. 35, 36; Miller Depo. pp. 126–128.

■ Sexual or racial harassment violates Title VII if it is 'sufficiently severe or pervasive "to alter the conditions of [the victim's] employment and create an abusive working environment." ' *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 2406, 91 L.Ed.2d 49, 60 (1986), *quoting Henson v. Dundee,* 682 F.2d 897, 904 (11th Cir.1982). An abusive working environment is one "so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers." *Meritor,* 477 U.S. at 66, 106 S.Ct. at 2405, 91 L.Ed.2d at 59. The abuse must be severe and pervasive: the incidents must be persistent, not isolated. *Id.* at 67, 106 S.Ct. at 2406, 91 L.Ed.2d at 60; *Rabidue v. Osceola Refining Co.,* 805 F.2d 611, 620 (6th Cir.1986), *cert. denied,* — U.S. ——, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987). While we must judge each case on the totality of its particular circumstances, *Meritor,* 477 U.S. at 67, 106 S.Ct. at 2406, 91 L.Ed.2d at 60; 29 C.F.R. § 1604.11(b) (1986), generally the case

---

1. Mr. Caylor strenuously denies these allegations.

law requires a sexual discrimination plaintiff to have been subjected to continued explicit propositions or sexual epithets or persistent offensive touchings to make out a hostile work environment claim. *E.g., Rabidue*, 805 F.2d 611 (office wall posters and calendars of female nudes and one employee's regular misogynist obscenities insufficient; surveys cases); *Scott v. Sears Roebuck & Co.*, 798 F.2d 210 (7th Cir.1986) (summary judgment for defendant where evidence showed one pat on the buttocks, winks, a suggestion of a rubdown, and an invitation to dinner); *Jones v. Flagship International*, 793 F.2d 714 (5th Cir.1986) (several propositions and display of statutes of bare-breasted mermaids as table decorations at a Christmas party insufficient).

■ The circumstances here fall short of even those circumstances found insufficient in *Rabidue, Scott,* and *Jones.* Snubs and unjust criticisms of one's work are not poisonous enough to create an actionable hostile work environment. As we have discussed in Part II, *supra,* the favoritism shown Hollihan did not violate Title VII. Hostile behavior that does not bespeak an unlawful motive cannot support a hostile work environment claim. *See Molthan v. Temple University*, 778 F.2d 955, 962 n. 1 (3d Cir.1985). Plantin's single comment about Miller's breasts does not suffice to create an atmosphere pervaded by sexual harassment, especially absent specific evidence that the comment's ˆunseemliness reached an outrageous degree.

## IV. Title VII: Discharge.

Aside from the hostile work environment and "paramour" claims, the amended complaint alleges that Miller's discharge violated Title VII in that preferential treatment of males motivated her firing. *See* Amended Complaint, paras. 24, 46. As evidence of this sexual animus, the amended complaint points to Miller's replacement by Joseph Crognali. *Id.* at paras. 33, 35, 37. Alcoa moves for summary judgment on this claim and argues there were legitimate business reasons for Miller's discharge. Brief in Support of Motion for Summary Judgment, pp. 16–17; Brief in Response to Plaintiff's Objection to Defendant's Motion for Summary Judgment, pp. 5–6. However, in her brief, Miller seems to abandon any claim of preferential treatment for males and seems to rest her claim exclusively on the favoritism shown Hollihan. Brief in Response to Defendant's Motion for Summary Judgment, pp. 2, 5–11. Nevertheless, we will address the disparate treatment claim raised by the amended complaint.

■ Miller has established a prima facie case of sex discrimination regarding her termination. She is female; she was qualified for the product technician position; Alcoa terminated her, and, arguably, replaced her with a male, Joseph Crognali. *See Chipollini*, 814 F.2d at 897. This showing alone, however, will not enable Miller to survive a motion for summary judgment if Alcoa proffers evidence of a legitimate non-discriminatory justification for the discharge. Miller then must adduce evidence to show that Alcoa's proffered reasons are pretextual. *See id.* at 898.

The Third Circuit Court of Appeals recently explained these principles and their application in several cases. In *Chipollini,* the court, sitting en banc, reversed a grant of summary judgment for the defendant in an age discrimination case because the district court required direct evidence of discrimination and mistakenly rejected plaintiff's evidence of pretextuality. 814 F.2d at 901–02. On summary judgment, the plaintiff must rebut defendant's proffered evidence of a legitimate justification for its actions, but that rebuttal may take the form of evidence directly showing that a discriminatory reason was the more likely motive or circumstantial evidence "showing that the employer's proffered explanation is unworthy of credence." *Id.* at 898. Such circumstantial evidence may consist of the identification of "inconsistencies and implausibilities in the employer's proffered reasons for discharge." *Id.* at 899. This is the type of evidence the district court erred in rejecting.

■ Unfounded challenges to an employer's proffered evidence of legitimate

justifications, however, will not carry an employee's burden of opposing an employer's motion for summary judgment in a Title VII case. In *Hankins v. Temple University*, 829 F.2d 437 (3d Cir.1987), the plaintiff made out a prima facie case that her termination from a hospital fellowship was due to sex and race. The defendant adduced evidence that plaintiff's poor performance caused her termination, and defendant moved for summary judgment. The district court granted the motion, and the court of appeals affirmed, despite contentions from the plaintiff that her supervisors treated her differently than they did men. For each instance of disparate treatment, the court found an undisputed legitimate justification based on the employees' individual experience and skills. 829 F.2d at 441–443. The court concluded that, at best, plaintiff raised the possibilities that her supervisors were mistaken in the appraisal of her skills or that personality conflicts lay behind some of plaintiff's difficulties at work. *Id.* at 443. Neither of these possibilities sufficed to carry plaintiff's burden.

*Sorba v. Pennsylvania Drilling Co., Inc.*, 821 F.2d 200 (3d Cir.1987), illuminates the intersection of *Chipollini* and *Hankins.* As in *Chipollini*, the court reversed a grant of summary judgment for the defendant because the district court had undervalued evidence that the plaintiff's employers did not really believe that plaintiff's work was unsatisfactory. 821 F.2d at 205. However, the court of appeals stressed that whether in fact plaintiff's performance was good or bad is not the issue in a discrimination case:

> This is not to say that the jury must decide the poor results were, in fact, Sorba's fault. The jury must only assess the employer's credibility with respect to its proffered reason. The jury need only decide whether the employer dismissed Sorba because of reports from his supervisors that they believed Sorba to be responsible for the poor results.

*Id.* The employer's intent is the ultimate issue in a Title VII case. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). Proof that an employer did not actually believe the stated reason for the employee's discharge permits an inference that that reason is a pretext for unlawful discrimination. *See Chipollini*, 814 F.2d at 897. But proof that the reason was mistaken or even unreasonable—unless so unreasonable as to cast doubt on its credibility, *see Loeb*, 600 F.2d at 1012 n. 6—does not raise an inference of discriminatory intent and will not carry plaintiff's burden in opposing a motion for summary judgment. *See Hankins*, 829 F.2d at 443; *Molthan v. Temple University*, 778 F.2d at 962.

■ Alcoa has introduced ample evidence of legitimate reasons for Miller's termination. Both parties stipulate that in February of 1983, well before Miller's termination, Alcoa decided to eliminate one of the two product technician positions. Pretrial Stip., III. 8; *see* Helsley Depo. pp. 70–71; Miller Depo. p. 90. Since there were only two technicians, Miller and Hollihan, the choice was between them. Mary Hollihan, the other product technician, had more experience in the position and received higher performance ratings than Miller. Defendant's Exhibit C; Plaintiff's Exhibits A, D; Cummings Aff., para. 7; Miller Depo. p. 91. From the start, Joseph Caylor did not think highly of Miller's work. Miller Depo. pp. 50–52, 63. Thus, on September 7, 1983, Alcoa chose to retain Hollihan instead of Miller. Miller's position was filled only temporarily by Joseph Crognali until December 12, 1983, *see* Equal Pay Act discussion, *infra;* after that, her position was eliminated. Pretrial Stip., III. 26, 37. Alcoa eliminated the position of product technician entirely in 1985. Pretrial Stip., III. 9.

Miller has not identified any implausibilities or inconsistencies in this account which could render it unworthy of credence. *See Chipollini*, 814 F.2d at 900. She admits that Caylor had a low opinion of her work. Miller Depo. pp. 50–52. Although she disagrees with his assessment, she offers no evidence to lead us to question the sincerity of Caylor's opinion. Even if favoritism toward Hollihan influenced Caylor's opinion,

Miller is caught on the horns of a dilemma: either Caylor fired her because he thought Hollihan did better work or because Hollihan was Plantin's inamorata. Either reason is legitimate under Title VII. *See Hankins,* 829 F.2d at 443 (honest, though perhaps mistaken, belief that plaintiff's performance was poor is a legitimate reason for discharge); *DeCintio,* 807 F.2d 304 (rejecting "paramour" claim).

### V. Title VII: Retaliation.

On September 7 or 8, 1983, Miller was informed that she would be terminated at the end of December, 1983, for poor performance. Pretrial Stipulation, para. III. 2, 32. On October 12, 1983, Miller filed a charge with the EEOC alleging sexual discrimination. Pretrial Stipulation, para. III. 35. Shortly thereafter, on November 7, 1983, Joseph Caylor, after consulting with Phillip Helsley, told her not to report to work anymore. Miller Aff., para. 39; Caylor Depo. pp. 17–18.

■ Miller claims that this sequence of events raises an inference that her early lay-off in November was in retaliation for the filing of her EEOC charge, in violation of 42 U.S.C. § 2000e–3(a). Alcoa moves for summary judgment as to this claim on two grounds. First, since Miller received full pay and benefits through December 31, 1983, she suffered no "adverse employment action." Second, Miller's supervisors were unaware of the EEOC charges as of the time they told her not to report to work; therefore, there is no causal connection between her early lay-off and her EEOC charge. Miller responds that she suffered adverse employment action in the form of the loss of the psychological benefit of having a job. She was unaware that her pay and benefits continued in full. Her supervisors and co-workers also "snubbed" her after she filed her charge. The brevity of the period between her EEOC filing and evidentiary materials of record indicating that Phillip Helsley knew of the filing before her discharge supply the causal connection.

The burdens and allocation of proof set forth in *McDonnell Douglas Corp. v.*

*Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), govern retaliation cases. *Ferguson v. E.I. duPont de Nemours and Co., Inc.,* 560 F.Supp. 1172, 1200 (D.Del.1983); Schlei and Grossman, EMPLOYMENT DISCRIMINATION LAW 557 (2d ed. 1983). To establish a prima facie case, the plaintiff must show that (1) he engaged in protected activity; (2) he suffered some adverse employment action; and (3) there was a causal connection between (1) and (2). *Ferguson, supra;* Schlei and Grossman, *supra,* at 133 (1983–85 Cumulative Supplement). "Essential to a causal link is evidence that the employer was aware that the plaintiff had engaged in the protected activity." *Ferguson, supra; see Hochstadt v. Worcester Foundation,* 425 F.Supp. 318, 324 (D.Mass.), *aff'd* 545 F.2d 222 (1st Cir.1976).

Miller has pointed to evidentiary materials of record which raise a genuine issue as to whether her superiors knew of her charges before her premature discharge. In its answer to plaintiff's third set of interrogatories, no. 2, Alcoa states that Phillip Helsley learned of the EEOC charges shortly after Thomas Plantin received the EEOC complaint. Helsley participated in the decision to discharge Miller on November 7. Caylor Depo., pp. 17–18.

■ Nonetheless, summary judgment is in order, for Miller's early lay-off was not adverse employment action. Miller received full salary and benefits as if she worked until December 31, 1983, her scheduled termination date. *See* Cummings Aff., para. 9; Pryor Aff.; Defendant's Exhibit E; Plaintiff's Answer to Defendant's Interrogatory no. 26(c) (Defendant's Exhibit K); Miller Dep. pp. 102–103. Miller was paid as if she were working, without having to show up for work. Although we have found no case on point, in both *Ferguson,* 560 F.Supp. at 1201, and *Yates v. Avco Corp.,* 819 F.2d 630, 638 (6th Cir.1987), the courts held that temporary transfers or demotions which reduce the employee's duties and responsibilities but maintain her salary and benefits as before do not constitute adverse employment actions.

We find the present situation analogous, especially because the record reveals that Miller had no chance of regaining her job. As we described in Part IV, *supra,* Alcoa had decided to eliminate one product technician and the supervisors believed that Mary Hollihan ought to be retained. After September 7, and before learning of the EEOC charges, Miller had no chance to prove that she, not Hollihan, should retain the one product technician position. In fact, her supervisors warned Miller that they would retain her until the end of December only if her performance did not deteriorate. Caylor Depo. p. 8. After September 7, Miller's performance did deteriorate in the eyes of her supervisors. Caylor Depo. pp. 9, 14–15. Miller denies that her performance deteriorated, but she does not allege that it got any better. She tried harder, but she was "frantic and upset." Miller Aff., para. 35. Nothing in the record supports Miller's belief that allowed to work until December 31, she could have persuaded Alcoa to retain her and fire Hollihan.

That Miller may have been unaware of the continuance of her full benefits through the end of 1983 does not matter. The benefits and salary in fact continued, and Miller did receive them. Miller Aff., para. 39.

Finally, the "snubbing" alleged by Miller does not amount to unlawful retaliation. As we make clear in our discussions of Miller's hostile work environment and intentional infliction of emotional distress claims, the law does not provide a remedy for all improper behavior. We cannot expect, let alone obligate, Miller's supervisors to act cordially toward one who had sued them.

VI. Equal Pay Act.

After Miller was told not to return to work on November 7, 1983, Joseph Crognali filled her position for thirty-five days. Miller's salary was $2,350 per month; Crognali received $2,560 per month during the time he filled Miller's position, the same salary he had received as a unit supervisor, the position from which he had been transferred. Miller Aff., para. 2; Plaintiff's Exhibit C. On December 12, 1983, Crognali returned to a position as a unit supervisor. Miller claims that this pay differential violates the Equal Pay Act, 29 U.S.C. § 206(d)(1).

Alcoa does not dispute that Crognali received higher pay than did Miller. Alcoa, however, maintains that this differential was based on a factor "other than sex." 29 U.S.C. § 206(d)(1)(iv). Crognali received a "red circle," or higher than normal, wage because he was temporarily reassigned to a lower position, product technician, from a higher position with higher pay, unit supervisor. *See* 29 C.F.R. § 1620.26 (1986).

Miller responds that whether Crognali's assignment was temporary is an issue of fact that should await resolution at trial. We disagree. The undisputed facts show that Crognali's reassignment was temporary and his higher salary justified for a reason other than sex.

The Equal Pay Act forbids paying employees of opposite gender different wages for the same work. 29 U.S.C. § 206(d)(1). The plaintiff has the burden to show this discrepancy. *Corning Glass Works v. Brennan,* 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974). Once she does, the burden shifts to the defendant employer to prove one of the four justifications listed in the statute. *Id.* at 196, 94 S.Ct. at 2229.

Unequal pay may be "based on any factor other than sex." 29 U.S.C. § 206(d)(1)(iv). The interpretive regulations to the Equal Pay Act specify "red circle" rates as a valid factor. 29 C.F.R. § 1620.26 (1986). The regulations describe temporary reassignment as an example of tolerable red circling:

> For a variety of reasons an employer may require an employee, for a short period, to perform the work of a job classification other than the employee's regular classification. If the employee's rate for his or her regular job is higher than the rate usually paid for the work to which the employee is temporarily reassigned, the employer may continue to pay the higher rate under the "red

circle" principle. For instance, an employer who must reduce help in a skilled job may transfer employees to less demanding work without reducing their pay, in order to have them available when they are again needed for their former jobs. Although employees traditionally engaged in performing the less demanding work would be paid at a lower rate than those employees transferred from the more skilled jobs, the resultant wage differential would not constitute a violation of the equal pay provisions since the differential is based on factors other than sex.

29 C.F.R. § 1620.26(b) (1986).

Joseph Crognali had been a unit supervisor at Alcoa's Continuous Ball Mill since December 1, 1982. Pretrial Stip., II. 22. As of August 1, 1983, his salary was $2,560 per month. Plaintiff's Exhibit C. In November of 1983, as a result of the permanent closing of the continuous ball mill, Crognali was temporarily assigned to the position of product technician. Val Cummings Aff., para. 10; Thomas Plantin Aff., para. 5. Although no definite time limit was set on this reassignment, it was to last only until he could return to a unit supervisor position. Caylor Depo., p. 19; Cummings Aff., para. 10; Plantin Aff., para. 5. Crognali did regain a unit supervisor position on December 12, 1983. Pretrial Stip., III. 37.

Miller has not pointed to any documents or depositions of record that would question these facts. She argues that since Crognali's employment records did not reflect a salary change, the reassignment was not temporary. Plaintiff's Brief in Opposition, p. 15; Plaintiff's Exhibits B, C. This argument begs the question of why Crognali's salary remained the same.

Under these facts, there is no question that red circling, not sex, produced Crognali's higher wage. Crognali had nearly a year's experience as a unit supervisor. Alcoa gave Crognali a job performance rating of 4–14 in October, 1983: his present performance was "good," and his future performance was anticipated to be "commendable." Plaintiff's Exhibits B, C. Alcoa

had good reason to wish to retain him when the continuous ball mill closed. *See Campbell v. Van Hoffman Press, Inc.,* 483 F.Supp. 218 (W.D.Mo.), *aff'd,* 632 F.2d 69 (8th Cir.1980) (desirability of a skilled worker makes more plausible his temporary red circling). No one disputes that the closing of the continuous ball mill caused Crognali's reassignment. His quick return to his former position—in thirty-five days—demonstrates that his reassignment was intended to be temporary. *See Campbell, supra* (one year red circling found to be temporary); *Gosa v. Bryce Hospital,* 780 F.2d 917, 918–19 (11th Cir.1986) (two-year temporary reassignment).

### VII. Breach of Contract.

Miller worked for Alcoa under an oral contract of employment. Amended Complaint, para. 69. She claims that defendant's "Performance Appraisal System," a copy of which is attached to the Amended Complaint, was part of her employment contract and that defendant breached her employment contract by not following the procedures set forth in the Performance Appraisal System in terminating her. We hold that established Pennsylvania law forecloses this breach of contract claim.

Absent a contractual provision to the contrary, employment contracts in Pennsylvania are presumed to be terminable at-will. *Geary v. United States Steel Corp.,* 456 Pa. 171, 319 A.2d 174, 176 (1974); *Reilly v. Stroehmann Bros. Co.,* 367 Pa.Super. 411, 532 A.2d 1212, 1213 (1987). The Pennsylvania courts have not decided whether employment at-will is inapplicable "where the employer has issued an employee handbook containing a provision that commits the employer to dismiss an employee for just cause only." *Banas v. Matthews International Corp.,* 348 Pa.Super. 464, 483–484, 502 A.2d 637 (1985) (en banc). However, even where the Pennsylvania courts have assumed that a handbook could have this effect, they have demanded clear evidence of the employer's intent that the handbook have this effect. *See Browne v. Maxfield,* 663 F.Supp. 1193, 1200 (E.D.Pa.1987).

We, too, will assume that Pennsylvania would recognize a contractual claim based on an employee handbook. Nonetheless, Miller has not submitted evidentiary materials showing that the Performance Appraisal System modified the at-will nature of her employment contract. This handbook describes its purpose as the improvement of job performance and the collection of information to facilitate personnel decisions:

> I. Corporate Policy—Performance Appraisal
>
> Alcoa's policy is that each salaried employee's work performance be systematically and objectively appraised based on job results.
>
> II. Objective—Performance Appraisal
>
> The primary objective of the Performance Appraisal system is to improve job performance. The Performance Appraisal system also provides information to management who make decisions on compensation, career and training and development.

Amended Complaint, Exhibit A, p. 3; *see also* Plaintiff's Exhibit 0. This handbook does not refer to or imply any restrictions on discharges. It does not promise that a formal performance appraisal will be held before employment is terminated, nor does it specify the procedure to be followed to terminate an employee. No reasonable employee would have interpreted this handbook to mean "that the employer intended to alter the pre-existing at-will status." *Martin v. Capital Cities Media, Inc.*, 354 Pa.Super. 199, 511 A.2d 830, 837 (1986) (holding that a handbook listing actions that would call for disciplinary action did not restrict the employer's right to terminate the employee without cause); *see Baker v. Lafayette College*, 350 Pa.Super. 68, 504 A.2d 247 (1986) (holding that a handbook's description of evaluation standards and procedures was insufficient to create an enforceable right to employment beyond a contract's term).

Additionally, for the terms of a handbook to be binding upon an employer, the employee must show that the terms were bargained-for, not gratuitous. *Martin*, 511 A.2d at 837; *Richardson v. Cole Memorial Hospital*, 320 Pa.Super. 106, 466 A.2d 1084 (1983). Miller has made no allegation in her amended complaint, affidavit, or deposition that she bargained for the Performance Appraisal System, or even that she knew of it before she was terminated.

## VIII. Emotional Distress.

Miller relies on the same facts adduced in support of her hostile work environment claim to establish state law claims for negligent and intentional infliction of emotional distress. *See* Part III, *supra.*

Taking these allegations as true, they do not constitute conduct extreme and outrageous enough to support a claim for intentional infliction of emotional distress. Defendant's conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Bradshaw v. General Motors Corp.*, 805 F.2d 110, 114 (3d Cir.1986), *quoting* Restatement (Second) of Torts, § 46 comment d; *see also Aquino v. Sommer Maid Creamery, Inc.*, 657 F.Supp. 208, 210–11 (E.D.Pa.1987). Generally, sexual discrimination in employment, absent direct propositions, threats, or unwelcome physical contact, falls short of the requisite outrageous. *See Hooten v. Pennsylvania College of Optometry*, 601 F.Supp. 1151, 1154 (E.D.Pa.1984); *cf. Bradshaw*, 805 F.2d at 115 (the employment relationship does not justify relaxation of the strict Pennsylvania standards).

In *Hooten*, the plaintiff alleged:

> Management made a continuum of disparaging remarks about both her marital status and her role as a mother. The harassment also took the form of purposely overloading her work schedule forcing her to commit errors which caused professional embarrassment. As a result of this activity, plaintiff collapsed at work and was ignored by her supervisors who refused to come to her aid. Plaintiff was eventually terminated from her employment....

601 F.Supp. at 1153. The court dismissed the complaint, holding these allegations to be insufficient.

 Miller's assertions have similar shortcomings. Favoritism, unjustified criticism, and adverse employment actions may be unfair, but they are not considered outrageous in our society. *See Aquino,* 657 F.Supp. at 210–211; *Wells v. Thomas,* 569 F.Supp. 426, 433–34 (E.D.Pa.1983). As for snubs, withheld invitations, and betrayed confidences, resolution of these incivilities does not belong to the judiciary. Similarly, an embarrassing remark about one's breasts, while surely improper in any social context, does not amount to actionable outrageous behavior, at least absent special circumstances or a particular viciousness about the remark. Miller has not supplied any detail about the remark which might debase it to the necessary level of atrocity. *See Hooten,* 601 F.Supp. at 1155.

Miller's claim for negligent infliction of emotional distress is without merit. Aside from when emotional distress accompanies physical impact or its threat or the contemporary observance of injury to a family member, infliction of emotional distress must be intentional or reckless to be actionable. *Pierce v. Penman,* 357 Pa.Super. 225, 240, 515 A.2d 948, 951 (1986); *Brooks v. Hickman,* 570 F.Supp. 619 (W.D.Pa. 1983).

## CONCLUSION

For the reasons we have stated, we will grant summary judgment for defendant on all plaintiff's claims, and we will dismiss the amended complaint.

An appropriate order will follow.