Mary Anne YOST, Plaintiff,

v.

WESTERN PENNSYLVANIA—WEST VIRGINIA SYNOD OF THE LUTHERAN CHURCH IN AMERICA, INC., Defendant.

Civ. A. No. 86–2117.

United States District Court,
W.D. Pennsylvania.

April 6, 1992.

Thomas A. Crawford, Jr., Pittsburgh, Pa., for plaintiff.

Patrick W. Ritchey, Pittsburgh, Pa., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

LEWIS, District Judge.

After hearing evidence and argument during a non-jury trial in the above-captioned case, and after having reviewed and considered the parties' post-trial submissions, the court enters the following findings of fact and conclusions of law:

### FINDINGS OF FACT

1. In 1984, defendant (the "Synod") comprised an organization of Lutheran

churches in the Western Pennsylvania and West Virginia regions affiliated with the Lutheran Church in America.

2. In June and July of 1984, three national church organizations, including the Lutheran Church in America, adopted a plan to merge into one body.

3. As a result of this merger decision, the Synod's operations were scheduled to cease at the end of 1987. The Synod did, in fact, cease operations on December 31, 1987.

4. During the fall of 1984, the Executive Board of the Synod considered the effect of the upcoming merger on its goals and operations. The Executive Board determined, for example, that the merger—with its consequent centralization of formerly localized activities—would result in less need for planning responsibilities at the Synod. The Executive Board of the Synod was also aware at this time that the number of Synod inserts to the national church magazine, *The Lutheran*, would be diminishing. In fact, the number of Synod inserts was reduced from ten to six in 1985.

5. Thus, at a meeting in late November of 1984, the Executive Board decided to eliminate the position of Coordinator of Planning and Communications ("CPC"). This position had been created by then-Synod president Kenneth R. May in the fall of 1974 to handle certain specific planning and communication duties. It was a unique paraprofessional position.

6. In 1984, the Synod had four categories of employees. Category I was for the President (later Bishop) and other officers of the Synod. Category II was for professional employees of the Synod, i.e., the assistants to the Bishop. Category III was a paraprofessional category. Category IV was for office and clerical employees.

7. The CPC job slated for elimination was the Synod's only Category III position.

8. The duties of the CPC consisted of approximately 50% planning responsibilities, approximately 25% communications responsibilities, and approximately 25% miscellaneous duties relating to Christian Associates or meetings of the Executive Board or staff.

9. The CPC's planning duties consisted of working with elected committees of the Synod on Synod consultation teams. Specifically, the CPC worked with the Committee on Budget and Finance in developing the Synod's budget. The CPC worked with the Committee on Research and Planning and the Synod consultation teams in developing the Synod Mission Profile.

10. The CPC's communications duties consisted of coordinating a periodic mailing of a newsletter, and editing the four-page Synod insert to the national magazine, *The Lutheran*. In addition, once a year the CPC would produce approximately ten pages of highlights of the Synod convention. Finally, the CPC also managed the Synod's audio/visual materials, prepared a catalogue of those audio/visual materials, and worked with the Committee for Media Ministry as liaison to Christian Associates.

11. The CPC's miscellaneous duties consisted of attending meetings of the Executive Board or other meetings of the staff.

12. Plaintiff, a female, was the only person who ever held the position of CPC, having begun in 1974 when the position was created.

13. At a meeting on January 4, 1985, however, defendant told plaintiff of the decision to eliminate the CPC position. At that meeting, plaintiff was informed that her job was being phased out. Plaintiff was also informed that she would receive three months of severance pay, although she was entitled to only two weeks' severance pay under the personnel practices of the Synod.

14. Although the personnel practices of the Synod afforded plaintiff the right to appeal her termination decision, plaintiff took no formal action to file such an appeal.

15. Following plaintiff's termination, no person occupied the position of CPC. No single person, male or female, assumed the core of her duties. In fact, the Synod's records indicate that the importance of the CPC's primary duties (i.e., planning and communications) decreased steadily after plaintiff's termination.

16. Consistent with the earlier projection by the Executive Board, Time Investment Records demonstrate that the amount of time spent by the full-time staff of the Synod on Synod Planning Operations greatly decreased following the termination of plaintiff's employment.[1] For example, in 1982 plaintiff reported 117.25 days of the total 131.25 days of staff time devoted to Synod Planning Operations, in 1983 plaintiff reported all 119 days devoted to Synod Planning Operations and in 1984 plaintiff reported 142.50 days of the total 157.50 days devoted to Synod Planning Operations. In 1985 and 1986, only 32.25 days and 16.50 days respectively were reported for Synod Planning Operations by the entire full-time staff.

17. In addition to the Time Investment Project Reports, the budget for 1986 and 1987 reflected a significant decrease in the time projected for planning and communications. In the 1987 budget, planning was projected at thirty-seven days and communications at nine days. In the 1986 budget, planning was projected at fifty days and communications at twenty-five days. In contrast, the 1985 budget—which was approved several months prior to the Synod's merger analysis and decision to eliminate plaintiff's job—projected 150 planning days and 100 communications days.

18. Some of plaintiff's planning duties continued after the elimination of her position, of course. Members of the Committee on Research and Planning and the Committee on Budget and Finance took over development of the Synod's budget and the Synod Mission Profile. The typing of the budget and the Synod Mission Profile, formerly done by plaintiff, was done by the secretaries.

19. After the CPC position was eliminated, some of plaintiff's communications duties were taken over by the Reverend E. Jerome Alexis. Reverend Alexis, working on a contract for service basis, took over the editing of the Synod insert to the national church magazine, *The Lutheran.* In no year did his income from these services exceed $2,000. Plaintiff was not offered this services contract.

20. The rest of plaintiff's communications duties, such as her duties concerning the newsletter and her duties concerning the audio/visual materials were assumed by the Synod's secretaries.

21. Shortly after plaintiff's termination, the illness of Bishop May and the accidental injury of one of the Bishop's assistants created an administrative vacuum at the Synod. Effective April 1, 1985, defendant hired the Reverend Edward R. Kappeler as a part-time administrative assistant to Bishop May in order to address this immediate need. Reverend Kappeler's duties as part-time administrative assistant to Bishop May consisted of the following: opening the Bishop's mail, carrying the mail to him and responding to it, acting as spokesman for Bishop May with the media, performing counseling work with pastors or congregations, and relieving the Bishop of some administrative details. These had not been plaintiff's duties. In addition, Reverend Kappeler was listed as the staff liaison to the Greater Pittsburgh Lutheran Television Task Force. Plaintiff had formerly served as staff liaison, but this required very little time.

22. Reverend Kappeler's duties did not include, and he in fact did not participate in, Synod budgeting or planning activities. Therefore, his apparently poor performance in budgeting and planning as the Director of Lutheran Social Services in 1972 neither bears on his ability to perform as Bishop May's assistant a dozen years later nor supports plaintiff's circumstantial attempt to paint the hiring of Reverend Kappeler with a tainted brush.

23. Shortly before and at the time Reverend Kappeler was hired, a dispute with a radical faction of the local Lutheran church known as the Denominational Minis-

---

1. Full-time employees of the Synod in Categories I, II and III maintained Time Investment Records which showed the number of days that they were involved in various projects throughout the year. These records were kept by the number of days. The term "days" was used as a measuring unit equal to eight hours. Thus, for example, if an employee spent twelve hours in a particular calendar day on a given project, that was reported as a time commitment of 1.5 days.

try Strategy ("DMS") intensified and became the focus of a large number of inquiries by the news media outside the Synod. Bishop May was concerned with this turmoil and saw the need to deal with pastors and congregations under stress. One of the reasons Reverend Kappeler was offered a part-time position was because of his background in counseling.

24. Reverend Kappeler has an undergraduate degree from the University of Pittsburgh, a Masters of Divinity Degree from the Lutheran Theological Seminary and a Masters Degree in Social Work from the University of Pittsburgh. Reverend Kappeler is licensed by the Commonwealth of Pennsylvania, is a member of the Academy of Certified Social Workers of National Association of Social Workers, and is a board-certified diplomat in clinical social work by Clinical Social Work Association.

25. In June of 1986, one and one-half years after plaintiff's termination and after another full-time assistant to the Bishop had resigned, Reverend Kappeler moved to full-time status. Only ordained ministers could be assistants to the Bishop. They were elected to four-year terms, and each one assisted with different aspects of the Bishop's large portfolio of responsibilities. The assistants to the Bishop were professional employees, had pastoral responsibilities and were Category II employees.

26. Plaintiff was not offered Reverend Kappeler's position. Of course, she is not an ordained minister and never performed pastoral duties as an employee of defendant.

27. Plaintiff has presented no direct evidence of gender-based discrimination. Defendant never articulated plaintiff's gender as the reason for either the elimination of her position or the failure to offer her positions later filled by males. To the contrary, uncontradicted testimony indicated that plaintiff's sex was not discussed at the Executive Board meeting in November of 1984 at which her position was eliminated.

## CONCLUSIONS OF LAW

Plaintiff originally asserted an action for redress of an alleged violation of Title VII of the Civil Rights Act of 1964 ("Title VII") as amended, 42 U.S.C. §§ 2000e *et seq.*, and the Equal Pay Act, 29 U.S.C. § 206, as well as pendent state law claims. All claims except for the Title VII count were dismissed by order of this court dated May 11, 1988.

The remaining count seeks back pay and other benefits arising out of the plaintiff's termination from her employment by the defendant on January 4, 1985. Plaintiff contends that her termination was due to discrimination against her on account of gender. This court disagrees.

Plaintiff has the burden of proving that defendant discriminated against her because of her sex. The burden of proof remains at all times upon the plaintiff. *Texas Dep't. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); *Lewis v. University of Pittsburgh*, 725 F.2d 910, 914–16 (3d Cir.1983), *cert. denied*, 469 U.S. 892, 105 S.Ct. 266, 83 L.Ed.2d 202 (1984); *Molthan v. Temple University*, 778 F.2d 955, 961–62 (3d Cir.1985).

In a disparate treatment case like this one, plaintiff must prove discriminatory intent. Indeed, discriminatory intent is the ultimate issue in a Title VII disparate treatment case. *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093; *Miller v. Aluminum Co. of Am.*, 679 F.Supp. 495, 503 (W.D.Pa.1988).

Plaintiff has presented no direct evidence of sex discrimination. Rather, plaintiff relies upon the shifting burden analysis outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). That familiar analysis proceeds as follows: first, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination; second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason for the employee's rejection; and, third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reason offered by the

defendant was not its true reason, but rather a pretext for discrimination. *Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1093.

At the close of plaintiff's case, the court concluded that she had successfully cleared the first hurdle of *McDonnell Douglas* by demonstrating a prima facie case of discrimination.

During the course of the trial, the court also found that the Synod had successfully shouldered its burden of articulating a legitimate, non-discriminatory business reason for plaintiff's termination.

■ The only question remaining, then, is whether plaintiff has proved "pretext." Plaintiff's burden at the third and final stage of the *McDonnell Douglas* analysis "merges with the ultimate burden of persuading the Court that she has been the victim of intentional discrimination." *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095; *Lewis,* 725 F.2d at 915. Under this burden, plaintiff must show that "but for" her sex, she would not have been terminated. *Lewis,* 725 F.2d at 915–17.[2]

■ A plaintiff cannot carry her burden of proving that defendant's proffered reason is pretextual by merely showing that the defendant was mistaken in its decision. *Hankins v. Temple University,* 829 F.2d 437, 443 (3d Cir.1987). Similarly, this court is not in the business of reviewing the wisdom or reasonableness of defendant's articulated reason. *Dale v. Chicago Trib-une Co.,* 797 F.2d 458, 464 (7th Cir.1986) ("Court does not sit as a super-personnel department that reexamines an entity's business decisions.... The question is not whether the [employer] exercised prudent business judgment."); *Tozzi v. Union Railroad Co.,* 722 F.Supp. 1236, 1241 (W.D.Pa. 1989) ("... plaintiff cannot create an issue for the jury simply by challenging defendant's business judgment."). Rather, the appropriate inquiry is whether the articulated reason is a pretext for sex discrimination.

Plaintiff failed to show that defendant's articulated reason was a pretext for sex discrimination. The Synod's decision to eliminate plaintiff's job position and to terminate her employment was a hard-nosed business judgment that the upcoming merger would reduce the amount of Synod planning and communications work, justifying the elimination of the CPC position.

The wisdom of this business judgment and the subsequent hiring of Reverend Kappeler as a part-time assistant to the Bishop is relevant at the third stage of the *McDonnell Douglas* analysis only if these decisions were so obviously baseless that they support plaintiff's theory of pretext. Similarly, because this is not a failure to hire case, the Synod's failure to offer plaintiff the jobs filled by the Reverends Alexis and Kappeler are relevant only to the extent that they tend to show a willful bias against plaintiff because of her sex that

---

**2.** The United States Supreme Court recently modified the evidentiary framework of *Burdine* by creating a new set of rules for Title VII mixed-motive cases. *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). A mixed-motive case is one in which the plaintiff proves that the adverse employment decision resulted from a mixture of legitimate business reasons and prohibited discriminatory motives. *Bowman v. Bank of Delaware,* 712 F.Supp. 1150, 1157 (D.Del.1989), citing *Price Waterhouse,* 490 U.S. at 247 n. 12, 109 S.Ct. at 1789 n. 12. *Price Waterhouse* did not change the analysis in pretext cases. *Hill v. Bethlehem Steel Corp.,* 729 F.Supp. 1071, 1072–73 (E.D.Pa.1989), *aff'd per curiam,* 902 F.2d 1560 (1990).

In a mixed-motive case, if the plaintiff proves that sex was a motivating factor in an adverse employment decision, "the defendant may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision if it had not taken the forbidden characteristic into account." *Bowman,* 712 F.Supp. at 1157 citing *Price Waterhouse,* 490 U.S. at 244–45, 109 S.Ct. at 1787–88. By contrast, in *Burdine*-like pretext cases, it is the plaintiff who must prove that the employer's proffered explanation for its action is false. *Price Waterhouse,* 490 U.S. at 247 n. 12, 109 S.Ct. at 1789 n. 12.

The parties have treated this case throughout the course of litigation as one focusing on pretext, not mixed motive. In addition, this court has not received a shred of evidence tending to prove that discriminatory animus played a role in the Synod's decision. Therefore, this is a *Burdine* pretext case, not a *Price Waterhouse* mixed-motive case, and plaintiff retains the burden of showing that "but for" her sex she would not have been fired.

she may then use to challenge the Synod's motive for its decision to terminate her. This court finds that none of the Synod's decisions and judgments support the inferences plaintiff wishes to draw. To the contrary, all have been adequately explained and supported by the defendant as legitimate and non-discriminatory.

For example, plaintiff failed in her attempt to use defendant's hiring of Reverend Kappeler to show pretext. First, plaintiff presented no evidence that the decision to hire Reverend Kappeler part-time was ever discussed or even considered prior to or at the time the decision was made to eliminate the CPC position. Second, defendant has explained that subsequent events (i.e., the illness of Bishop May, the accidental injury to one of Bishop May's assistants and the DMS crisis) necessitated the creation of a part-time administrative assistant position. Third, as a part-time employee, Reverend Kappeler took over only some of plaintiff's communication duties and performed none of the planning and budgeting duties previously performed by plaintiff in 1985. Fourth, Reverend Kappeler's move to full-time status at the end of June of 1986 occurred one and one-half years after plaintiff's termination of employment and only after another full-time assistant to the Bishop had resigned. Fifth, evidence of allegedly poor performance by Reverend Kappeler as the Director of Lutheran Social Services in 1972, at the latest, does not show any pretext in defendant's articulated reason. Contrary to plaintiff's claim that the Bishop was aware of the reasons for Reverend Kappeler's resignation in 1972, plaintiff failed to show that the reasons were ever discussed with Bishop May. The alleged performance deficiencies were also at least thirteen years prior to the decision to hire Reverend Kappeler part-time. Finally, plaintiff has presented no evidence that the reasons articulated by defendant for creating this position were untrue or that the alleged failure to offer this position to plaintiff or the selection of Reverend Kappeler was because of sex.

Similarly, defendant's failure to offer plaintiff the jobs offered to the Reverends Alexis and Kappeler does not demonstrate that defendant's proffered reason for termination is merely a pretext. First, defendant has explained that Reverend Alexis was employed on an as-needed basis offering limited income potential, and that it was felt that plaintiff should get three months of severance so that she had time to seek other employment. Second, defendant has also explained that Reverend Kappeler performed duties in addition to those done by plaintiff, especially pastoral and counseling duties. Specifically, it was believed that Reverend Kappeler's counseling background would be of assistance in dealing with pastors and congregations under stress because of the DMS turmoil rocking the Synod at that time. Finally, plaintiff presented no evidence to contradict these explanations or to show that plaintiff's sex played any role in these decisions.

In summary, the 1984 decision of the three national Lutheran churches to merge had a significant impact on the future needs and direction of the Synod. Reflecting on these material changes, and their potential impact on the Synod's operational needs, the Executive Board of the Synod concluded that the CPC position held by plaintiff was expendable. While one may lament the fact that business principles and methods (e.g., budgets, income statements and time reports) have crept into our religious organizations, and regret the economic and personal pain that such a bottom-line orientation caused the plaintiff in this case, this hand-wringing will not create a cause of action under Title VII where none exists.