No. 70,012

DEBRA G. HERMAN, *Appellant,* v. WESTERN FINANCIAL CORPO-
RATION, COLUMBIAN SAVINGS ASSOCIATION, F.A., DAN WELCH,
CHARLES STEIGLER, ALLEN HARNISCH, and M.D. VAUGHN,
*Appellees.*

(869 P.2d 696)

Opinion
filed March 4, 1994.

*Kirk W. Lowry,* of Palmer & Lowry, of Topeka, argued the cause and
was on the brief for appellant.

*Andrew F. Sears*, of Bennett, Lytle, Wetzler, Winn & Martin, L.C., of Prairie Village, argued the cause, and *Patricia A. Bennett*, of the same firm, was with him on the brief for appellees.

The opinion of the court was delivered by

ALLEGRUCCI, J.: This is an appeal by Debra G. Herman from the order of the district court granting summary judgment in favor of the defendants, Columbia Savings Association, F.A., (Columbia Savings) and various individuals, on her cause of action for hostile work environment, sexual harassment in violation of 42 U.S.C. § 2000e-2(a)(1) (1988), and retaliatory discharge. This case was transferred from the Court of Appeals pursuant to K.S.A. 20-3018(c).

Debra Herman was employed by Columbia Savings and its predecessor from April 1986 until she was fired on April 5, 1990. She was the regional mortgage loan operations manager, and her supervisor was the regional mortgage loan vice-president, Dan Welch.

Welch started working at Columbia Savings in the fall of 1987. Herman described Welch as "a real social person." She testified that during the first six months to one year of his employment there, Welch "was constantly touching, rubbing my neck, very intimate as far as physical contact, in the office, in front of other people," which made her feel uncomfortable and embarrassed. She denied that Welch ever touched any part of her body other than her neck, back, and shoulders. She testified that he conducted himself in the same way toward "several others also."

She also testified that "[t]he dirty jokes, the innuendos spoken, were daily." She explained what she meant by "innuendos" in the following way: "Rude gestures, different phrases that he would say that would—calling one of the employees, well, she's really stacked, the rude comments, the jokes."

On one occasion when Columbia Savings employees had gone out socially, Herman and Welch went to their cars, which were parked side-by-side. According to Herman, Welch "started to lean me back up against my car. He started to kiss me. I laughed at him at the time, because he was very drunk." She testified that she also had been drinking and that she "[d]idn't think a whole lot of it at the time."

It appears that this incident occurred in June 1988. Herman testified that Welch never again touched her neck or back or put his arm around her or tried to kiss her. Nor did he make "sexual comments" to her, although he continued to tell jokes and use sexual innuendos when in a group.

Herman testified that as a result of the attempted kiss, she stopped going out socially with the other Columbia Savings employees. Welch commented to her that she had become antisocial. Herman testified:

"After that point when things started becoming uncomfortable—I prior to that spent a lot of time with Dan. We worked very closely together on problems in business, day-to-day activities. Again, I tried to avoid any situation where I might be alone with him, including in his office."

Herman testified that from the time Welch started at Columbia Savings, he drank "quite heavily," but at first it did not affect his work. By March or April, 1988, however, he was coming into the office inebriated and missing appointments. Herman testified that the employees in the loan department "were covering for him." She stated:

"Communication virtually stopped with everyone. We just were kind of in limbo. We didn't know—he was responsible for the department and making certain decisions, but we couldn't get decisions made or get them—get him to answer or get him to tell us."

Herman testified that the morale of the employees in the loan department was affected and that she "was very frustrated."

Herman also complained about Welch's conducting a sexual relationship with Sheryl Heitman, another Columbia Savings employee. The affair began sometime in 1988, probably after June 1988. Welch was married. Herman viewed his involvement with Heitman, along with his drinking, as accounting for his absence from the office during working hours. Herman testified that she sometimes saw Welch's car in the parking lot at Heitman's apartment. When she returned to the office one evening in the fall of 1988, Herman heard giggling, laughing, "moans and groans" from Welch's office and a woman saying, "Oh, Dan." Herman identified the woman's voice as Heitman's.

Herman testified that after June 1988, Welch "was leaving me alone." It was at that time, however, when the hostile work environment of which Herman complains developed. Herman

testified that the relationship between Welch and Heitman "caused a very, very hostile work environment for not just myself but for many people." Herman testified:

"It was very, very uncomfortable to work around—and very embarrassing, to work around the atmosphere when Sheryl is sitting on Dan's desk with her legs crossed, with her skirt clear up, and there's—and this is in the lobby and there's customers everywhere, when realtors and builders know this and ask employees, you know, who's the blond and what's going on, makes it very uncomfortable for everyone."

Herman also testified that

"[Welch and Heitman are] gone out of the office. He's not there to make decisions or to help. He's not there when he's supposed to be. He tells people—he sets up appointments and the closing. They have to cancel it. And which creates a lot of work for a lot of people to redo."

In summary, Herman believed that Welch's absence from the office, his drinking, and his relationship with Heitman affected Herman directly by increasing the amount of work she had to do in supervising the employees in the loan department. She believed that Welch's failures were "a reflection on" her because realtors and customers did not understand why "things weren't done as promised by Dan Welch."

Charles D. Steigler, Jr., was regional manager and senior vice-president of Columbia Savings. In June 1989, Steigler and Welch talked to Herman about making some staff cuts. They also advised her that there were rumors being spread about Welch and Heitman and that the rumors were not true. Herman subsequently met individually with Steigler and told him for the first time of her belief about the relationship between Welch and Heitman.

Steigler then conducted a staff meeting at which he denied the rumors that Welch and Heitman were having an affair. He testified that he told the staff: "Basically, we've got work to do. Whatever's happened, I checked it out. I don't concur with it. We've got work to do. Let's tend to your business." Two tellers quit immediately after the meeting. One of them told Steigler she knew the rumors to be true.

Steigler testified that the employees were divided between those who believed and those who did not believe that Welch and Heitman were having an affair. He described the office environment as "uncomfortable" for awhile. He seems to have been

of the opinion that the departure of the two tellers reduced the level of discomfort, but he said that the environment remained uncomfortable until Debra Herman left in April 1990.

Additional facts will be stated as necessary to our discussion of the issues raised in this appeal.

The first issue is whether the district court erred in granting summary judgment in favor of the defendants on Herman's sexual harassment claim in the form of an abusive or hostile work environment.

"Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. To defeat a properly supported motion for summary judgment, the nonmovant must come forward with specific facts showing that there is a genuine issue for trial." *Mark Twain Kansas City Bank v. Kroh Bros. Dev. Co.*, 250 Kan. 754, Syl. ¶ 1, 863 P.2d 355 (1992).

"The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. [W]here . . . reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. [Citation omitted.] . . . If factual issues do exist, they must be material to the case to preclude summary judgment." *Bacon v. Mercy Hosp. of Ft. Scott*, 243 Kan. 303, 306-07, 756 P.2d 416 (1988).

In the present case, the basis for the district court's ruling was that Herman "never made a showing that she was discriminated against because of her gender." In pertinent part, the district court's decision states:

"Defendants are correct in their claim that plaintiff must show some form of gender based discrimination to support her Title VII claim. *Wolff v. Berkley Inc.*, 938 F.2d 100, 103 (8th Cir.). In order to support her claim, the plaintiff must establish a prima facie sex discrimination case. *Benton v. Kroger Co.*, 640 F. Supp. 1317, 1322 (S.D. Texas 1986). In *Fair v. Guiding Eyes for the Blind Inc.*, 742 F. Supp. 151, 155 (S.D.N.Y. 1990), it was held that a showing must be made that but for the fact of her sex, the plaintiff would not have been the object of harassment. In other words, to establish a claim under Title VII, 'the plaintiff must show that she was treated differently than similarly situated persons of the other gender.' Id. at 156. Furthermore, in *Miller v. Aluminum Company of America*, 679 F. Supp. 495 (W.D. Pa. 1988), the court held that an alleged affair was simply inadequate to support a claim for violation of Title VII.

"In this case, the plaintiff has failed to demonstrate the requirements of a Title VII claim. She has simply never made a showing that she was

discriminated against because of her gender. Indeed, the [defendants] claim in their response that 'The rumors of the alleged affair very definitely affected the Topeka branch office of Columbia Savings by dividing it between those that believed and those who didn't.' Clearly, this allegation indicates that the alleged affair affected every individual in the office, regardless of sex. Conversely, plaintiff has failed to prove that she was ever harassed *on the basis of her sex.*

"Plaintiff attempts to support her Title VII claim with a conclusion that this 'was the type of conduct that affects women in the workplace more than men.' This is simply not supported by the evidence. At any rate, this claim is subsumed by both the *Fair* case and the *Miller* case, both of which dealt with the concept of a 'hostile work environment.' "

In its recent decision in *Harris v. Forklift Systems, Inc.*, 510 U.S. ____ 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993), the United States Supreme Court considered the "definition of a discriminatorily 'abusive work environment' (also known as a 'hostile work environment') under Title VII of the Civil Rights Act of 1964." 126 L. Ed. 2d at 300. *Certiorari* was granted for the specific purpose of resolving the question whether conduct which did not produce a serious effect on the claimant's psychological well-being was actionable. 126 L. Ed. 2d at 301. The Supreme Court unanimously rejected the psychologically injurious standard. The standard "reaffirmed" in *Harris* "takes a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury." 126 L. Ed. 2d at 302.

The Supreme Court's concise opinion in *Harris* serves as a primer on the subject of sexual harassment that takes the form of a hostile work environment. What is clear from that opinion and germane to the present case is that hostile work environment claims, like all other Title VII claims, are claims that members of one sex (race, religion, etc.) are treated differently from members of another. Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to . . . conditions . . . of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). In other words, Title VII is violated by disparate treatment of, in this case, men and women. In a case such as the present one, Title VII comes into play when there is discriminatory conduct sufficiently severe or pervasive to create a work environment

abusive to employees because of their gender. 126 L. Ed. 2d at 302. In the Supreme Court's words,

"Certainly Title VII bars conduct that would seriously affect a reasonable person's psychological well-being, but the statute is not limited to such conduct. So long as the environment would reasonably be perceived, and is perceived, as hostile or abusive, Meritor [Savings Bank v. Vinson, 477 U.S. 57, 67], there is no need for it also to be psychologically injurious.

"This is not, and by its nature cannot be, a mathematically precise test. . . . But we can say that whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." 126 L. Ed. 2d at 302-03.

In the present case, the district court found that the evidence simply did not support Herman's claim that she, along with the other women in the office, had been subjected to disadvantageous conditions of employment to which men in the office were not subjected. Herman contended that there was disparate treatment of women in that the charged atmosphere of the workplace was more offensive to them.

Another argument which Herman hints at is that the impact rather than the treatment was disparate. Without stating it as a legal theory, Herman spelled out circumstances from which she wanted the district court to infer that the hostile work environment at Columbia Savings at the time of the alleged affair between Welch and Heitman caused or contributed to causing the turnover of five female employees.

Even if Herman had developed the legal theory and provided some authority for an impact as opposed to a treatment analysis being appropriate to this individual sexual harassment/sex discrimination case, summary judgment would have been proper due to the deficiencies in her proof. Herman shows that five female employees quit or were fired during the period when Welch and Heitman were alleged to have been sexually involved. It is the defendants' position that any hostility in the work environment resulting from Welch's involvement with Heitman was the same for male and female employees. Herman argues that it triggered the end of their employment for five women but no men. For this evidence to have any significance, Herman would

have to show with some simple figures the demographics among the workers who potentially were affected by Welch's conduct. If all those potentially affected were women, the fact that more women than men left would not be meaningful in this context.

Moreover, the reasons advanced by Herman for the women leaving their employment at Columbia Savings seem to be, at best, too many steps removed from sexual harassment to be actionable under Title VII. There is no claim that any of the women left because they were targets of Welch's sexual advances or subject to his physical contact or jokes and innuendos. Herman has provided citations to legal authority for the proposition that a woman need not be singled out as the object of harassment to have a Title VII claim against an employer that permits or maintains an atmosphere where harassment is pervasive. That, however, is not the issue here. The issue is that sexual harassment really is not what is being complained about. Herman includes in her recitation of facts incidents of advances, contact, jokes, and innuendos, but those incidents are not alleged to have caused the women to leave Columbia Savings.

The complaints of the five women who left are only incidentally linked to sexual activity. Welch, according to Herman, was neglecting his work and acting in an unprofessional manner due in part to his preoccupation with Heitman. The resentment of other employees was stirred because they believed that they were burdened with compensating for Welch's shortcomings and was compounded when management took the position that their complaints were unfounded and, in fact, fabricated. The only sexual activity involved is the alleged affair between Welch and Heitman. It, along with his drinking, is alleged to have been detrimental to his job performance. We do not believe that an actionable Title VII claim may be made simply from allegations that female employees had to take up the slack for a male supervisor who was shirking his duties while involved in a consensual affair with another supervisor.

Federal courts faced with claims of hostile work environments created by an affair between noncomplaining employees have concluded that such circumstances fall short of violating Title VII. In *Miller v. Aluminum Co. of America*, 679 F. Supp. 495 (W.D. Pa.), *aff'd* 856 F.2d 184 (3d Cir. 1988), the plaintiff complained

that her supervisor unjustly criticized her work while exempting a co-worker from criticism because the co-worker was involved in a sexual relationship with the plant manager. She also complained of being snubbed, being assigned to menial jobs, and being subjected to embarrassment when the co-worker betrayed her confidences to the plant manager. 679 F. Supp. at 500-01. The district court stated that the conditions of which Miller complained were "not poisonous enough to create an actionable hostile work environment" and that "[h]ostile behavior that does not bespeak an unlawful motive cannot support a hostile work environment claim." 679 F. Supp. at 502.

In *Drinkwater v. Union Carbide Corp.*, 904 F.2d 853 (3d Cir. 1990), the plaintiff complained that the sexual affair between her supervisor and a female employee who was the plaintiff's subordinate created a hostile work environment. Drinkwater contended that she should not be oppressed because her male supervisor's attraction to a co-worker interfered with the workplace. The Third Circuit Court of Appeals found support for Drinkwater's legal theory in the EEOC Sexual Harassment Guidelines, 29 C.F.R. § 1604.11(a) (1985). 904 F.2d at 859. The Court of Appeals also examined relevant case law, which it described as "still relatively sparse." 904 F.2d at 859. The court noted that the hallmark of this line of cases is that "it is the environment, not the relationship, that is actionable. The relationship may contribute to the environment, but it is the workplace atmosphere that is critical." 904 F.2d at 861. The court observed:

"A sexual relationship between a supervisor and a co-employee could adversely affect the workplace without creating a hostile sexual environment. A supervisor could show favoritism that, although unfair and unprofessional, would not necessarily instill the workplace with oppressive sexual accentuation. The boss could treat everyone but his or her paramour badly and all of the subordinates, save the paramour, might be affected in the same way." 904 F.2d at 862.

Under New Jersey law, which the federal court was obliged to apply, "this kind of situation does not create a claim for sexual harassment." 904 F.2d at 862. Unable to distinguish the facts alleged by Drinkwater, the court concluded that summary judgment against her was proper. The court concluded that Drinkwater had not come forward with sufficient evidence to show that

the workplace environment caused her to suffer because of her sex. 904 F.2d at 863.

In the present case, the district court commented in a similar vein that the evidence that the rumors of an affair between Welch and Heitman divided the employees into two camps, believers and nonbelievers, established that all employees regardless of gender were affected. Evidence of a division in the ranks does not seem, however, to be a sound evidentiary basis for the conclusion that the effect did not depend on gender. This portion of the district court's reasoning is unnecessary to its conclusion.

In summary, we find that the entry of summary judgment against Herman on her gender discrimination claim was proper. The burden of her proof was that due to Dan Welch's conduct the workplace environment at Columbia Savings would reasonably be perceived as hostile or abusive to female employees and not so to male employees. This she failed to do.

The evidence tending to show that it was women who were exposed to disadvantageous conditions consisted of Welch's unwelcome advances to Marlene Sisson and Herman. Sisson testified that on one occasion Welch "grabbed me around the waist and pulled me back against him." The reasons which Sisson gave for leaving Columbia Savings, however, do not include this incident and seem to be gender-neutral. She complained of "a lot of tension" due to her female supervisor bringing personal problems to work with her and to Welch being unavailable physically and temperamentally for consultation. She also complained of her employer's failure to train her in closing procedures as promised. Herman testified that at the end of a social evening when she and Welch both had been drinking, he tried to kiss her. That incident was in June 1988, and she testified that there were no more unwelcome advances. Her counsel denied that she was basing her claim on the attempted kiss.

The other evidence which Herman produced was of the embarrassment and additional work which employees experienced as Welch's job performance suffered. Herman did not produce evidence which demonstrates that women but not men were exposed to these conditions. Thus, even though these disadvantageous conditions were created at least in part by Welch's con-

sensual sexual relationship with Heitman, they do not give rise to a gender discrimination claim under Title VII.

Herman did not make a prima facie case of sex discrimination. From the evidence produced in conjunction with the motion for summary judgment, she is unable to sustain the ultimate burden of showing that the conditions created by Welch's conduct, in particular his consensual relationship with another employee, would reasonably be perceived as hostile to the women and not the men employees. As stated by Justice Ginsburg in her concurring opinion in *Harris*: "The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." 126 L. Ed. 2d at 304. We find the district court's entry of summary judgment was proper.

The next issue is whether the district court erred in granting summary judgment in favor of the defendants on Herman's retaliatory discharge claim. The reasons given by Columbia Savings in April 1990 for terminating Herman were her poor work performance, insubordination, failure to get along with others, and bad attitude. The precipitating event was Herman's removing the loan file of Mike Martin from the office and turning it over to her attorney, who discussed it in a telephone conversation with Allen Harnisch, vice-president and general counsel of Columbia Savings. Herman contends that she actually was fired because she reported irregularities in the mortgage loan file of Mike Martin. Without deciding whether there was merit to Herman's claims of irregularities, the district court concluded that she could not prevail on her retaliatory discharge count because she could not show that the alleged irregularities amounted to violations of "'rules, regulations, or the law pertaining to public health, safety, and the general welfare'" (quoting *Palmer v. Brown*, 242 Kan. 893, 900, 752 P.2d 685 [1988]).

Herman had participated in the denial of an earlier application to Columbia Savings for a bond loan to Martin and his wife. The earlier application by the Martins for a bond loan was denied, at least in part, because Mike Martin was a Columbia Savings employee and regulations prohibited bond loans being made to employees. In her response to the motion for summary judgment,

Herman controverted the defendants' statement that the earlier Martin application was denied solely because it was for a bond loan. She stated that an additional reason for denial was the Martins' failure to qualify "pursuant to Columbia Savings Regulations on qualification." The evidence does not support her position. For example, Herman cited pages of Steigler's deposition which tend to support the defendants' statement rather than her own. Steigler testified:

"The loan process dragged on for a long time with the end result being that we denied the loan because he didn't qualify for the bond money because he was an employee which Mike Martin, I think, conversed with Dan Welch and possibly mentioned something to me, was very upset that if anybody should have known that rule, Deb Herman should have known that rule. It wasn't a matter of qualifying or not qualifying. It wasn't a matter as far as financial or credit. It was a matter of he could have been turned down on day one by Deb Herman saying that we can't make a loan with employees."

Several months after denying the Martins' application for a bond loan, Columbia Savings gave them a purchase money mortgage loan. The defendants state that the loan was for $49,222.60; Herman states that the mortgage and note were for $50,000. The parties agree that the collateral was valued at $95,000.

Even if Herman's allegations of violations of the guidelines and/or regulations were true, it would not have changed the trial court's ruling. The district court ruled that the internal policies and guidelines of Columbia Savings were not a rule, regulation, or law pertaining to public health, safety, and the general welfare within the meaning of *Palmer*, 242 Kan. 893, Syl. ¶ 3. There, the court stated:

"To maintain an action in tort for retaliatory discharge for 'whistle-blowing,' an employee has the burden of proving by clear and convincing evidence, under the facts of the case, a reasonably prudent person would have concluded the employee's co-worker or employer was engaged in activities in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare; the employer had knowledge of the employee's reporting of such violation prior to discharge of the employee; and the employee was discharged in retaliation for making the report. However, the whistle-blowing must have been done out of a good faith concern over the wrongful activity reported rather than from a corrupt motive such as malice, spite, jealousy or personal gain."

Herman's first-line argument seems to be that the underwriting guidelines of Columbia Savings are rules pertaining to the general welfare. She contends that the cost currently borne by taxpayers for the collapses of savings and loan associations is the detriment suffered when internal policies and guidelines are violated. Rather than arguing that Columbia Savings' internal guidelines are the sorts of rules which necessarily were within the anticipation of the court when *Palmer* was decided, she seems to be arguing that the general welfare would be served if they were to be included within the *Palmer* category.

Herman's argument is expressed in part in terms of "public policy." She argues that the court should declare it to be the public policy of the State of Kansas to encourage savings and loan employees to report irregularities in loan files. Her springboard for this argument is the following language from *Pilcher v. Board of Wyandotte County Comm'rs*, 14 Kan. App. 2d 206, 211, 787 P.2d 1204, *rev. denied* 246 Kan. 768 (1990):

> "As we pointed out earlier, there are activities which an employee-at-will may engage in for which the employee cannot be discharged. One of the activities for which an employee may not be fired is that activity commonly known as 'whistle-blowing.' In essence, *public policy* dictates that an employee-at-will may not be discharged for reporting an unlawful or improper act of his or her employer. Relief for the tort of retaliatory discharge is available where the discharge contravenes a clear *public policy*." (Emphasis added.)

Herman confuses the public policy of prohibiting terminations due to whistle-blowing, as in *Pilcher*, with the more basic idea of categorizing a savings and loan association's granting a loan where the application does not meet underwriting guidelines as "an unlawful or improper act of his or her employer." Whether the granting of such a loan constitutes an unlawful or improper act is the question which the district court answered in the negative. That is, the district court correctly concluded that it did not violate "rules, regulations, or the law pertaining to public health, safety, and the general welfare."

Herman does not argue that *Pilcher* broadened the scope of conduct from unlawful to improper which may be reported and give rise to a retaliatory discharge claim. *Palmer* involved unlawful

conduct. In contrast to the present case, *Pilcher* involved improper conduct by local government.

Palmer was the administrator of the in-house laboratory for Associates in Family Care, P.A. (AFC). She sued AFC and the AFC doctors, alleging that she was discharged for giving information to authorities which supported her suspicions that at least one of the doctors was billing Medicaid for lab work which had not been performed. 242 Kan. at 894-95. The issue for the court's consideration was whether her discharge for reporting her employer's alleged violation of the law could be a tort. In reaching its conclusion that Palmer had stated a cause of action in tort, the court noted that "Medicaid fraud is a felony under both state and federal law." 242 Kan. at 899.

Pilcher was discharged from her position as a case manager in the community corrections agency in Wyandotte County. She alleged that she was discharged "because her superiors *believed* she was the source of an article in the Kansas City Times which was highly critical of certain hiring practices engaged in by the county." 14 Kan. App. 2d at 211. The Court of Appeals concluded that Pilcher's evidence satisfactorily "showed all of the elements required by *Palmer*." 14 Kan. App. 2d at 212.

We find Herman's evidence does not meet the elements required by *Palmer*. In *Palmer*, we said:

"To maintain such action, an employee has the burden of proving by clear and convincing evidence, under the facts of the case, a reasonably prudent person would have concluded the employe's co-worker or employer was engaged in activities in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare; the employer had knowledge of the employee's reporting of such violation prior to discharge of the employee; and the employee was discharged in retaliation for making the report. However, the whistle-blowing must have been done out of a good faith concern over the wrongful activity reported rather than from a corrupt motive such as malice, spite, jealousy or personal gain." 242 Kan. at 900.

The district court's entry of summary judgment was correct.

The final issue is whether the district court erred in denying Herman's motion to amend her petition to add a claim for retaliatory discharge under Title VII.

42 U.S.C. § 2000e-3(a) (1988) provides in pertinent part:

"It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed

any practice made an unlawful employment practice by this subchapter, or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

Herman filed her petition on December 5, 1990. It contained two counts: retaliatory discharge for reporting irregularities in the Martin loan file and sexual harassment under Title VII. On August 20, 1992, Herman filed a motion seeking leave to amend her petition to add a claim for retaliatory discharge under Title VII.

The defendants opposed the motion to amend. On November 4, 1992, the district court asked counsel for Herman to respond to argument advanced by the defendants that the proposed amendment did not state a cause of action. In addition, oral argument was held. On December 21, 1992, the district court issued a memorandum decision denying the motion to amend. The rationale of the district court was that Title VII did not apply because there was no merit to Herman's sexual harassment claim under Title VII. Here, Herman charged that she and other employees were the subjects of sexual harassment in violation of Title VII. She sought to amend her petition to add the claim that she was discriminated against by her employer because she made that charge.

Herman cites to a federal case, *Jennings v. Tinley Park Comm. Consol. Sch. Dist.* 146, 864 F.2d 1368 (7th Cir. 1988), which supports her position that she need not prove that the employer's conduct violated Title VII. The Seventh Circuit Court of Appeals stated: "The plaintiff need not establish that the action she was protesting was actually an unlawful employment practice; but rather only that she had a reasonable belief that the action was unlawful. *Berg v. La Crosse Cooler Co.*, 612 F.2d 1041, 1045-1046 (7th Cir. 1980)." 864 F.2d at 1372.

The defendants contend that Herman's proposed amendment did not state a cause of action. First, they argue that the claim was time barred because when Herman sought to add it, more than 90 days had passed since the EEOC had issued her right-to-sue letter. They do not cite any authority for their position. There does not seem to be any merit to this argument. K.S.A. 60-215(c) provides in pertinent part as follows: "Whenever the claim or defense asserted in the amended pleading arose out of

the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading."

Second, the defendants contend that the "proposed amendment had no substance under Title VII." This appears to be the rationale of the district court, with the added twist that the defendants assert that Herman did not believe that she or the other employees were being subjected to sexual harassment. This seems to be a reference to the Seventh Circuit's requiring the plaintiff's belief that the conduct was unlawful to be reasonable. See 864 F.2d at 1372.

The defendants also object to the amendment on the ground that Herman delayed too long before seeking leave to add the count for retaliatory discharge under Title VII. They state that discovery was closed by the time she filed her motion to amend. They contend that additional discovery would have been necessary if the amendment had been permitted. They contend that "the expense and delay of new discovery would have been prejudicial" to them.

Herman argues that there were no surprises in her proposed retaliatory discharge under Title VII claim because she already had pled retaliatory discharge and violation of Title VII. She denies, therefore, that the defendants would have been prejudiced by the amendment.

Even though Herman's retaliation and employment discrimination claims both had been explored in the course of discovery, the defendants had no reason to inquire about a link between the two. In her response to the defendants' initial motion to dismiss or strike, Herman stated that "the Plaintiff has not pled a retaliatory discharge claim under Title VII." It seems entirely plausible, therefore, that some additional discovery would be necessitated by the proposed amendment. It is questionable that the amount or type of additional discovery would be overly burdensome or prejudicial to the defendants.

With regard to appellate review of a district court's decision on amending pleadings, this court has stated: "A trial court is given broad discretionary power under K.S.A. 60-215 to permit the amendment of pleadings, and its actions thereto will not constitute reversible error unless it affirmatively appears that the

amendment allowed or denied is so material it affects the substantial rights of the adverse party." *Williams v. Amoco Production Co.*, 241 Kan. 102, Syl. ¶ 2, 734 P.2d 1113 (1987). In *Williams*, the plaintiffs initially claimed damages for crop loss to two sections (1,280 acres). Although it was 10 years later and 4 months before trial, they were allowed to amend their pleadings to add a damage claim for 1,700 additional acres, and this court found no abuse of discretion. 241 Kan. at 109-10.

In *Schierenberg v. Hodges*, 221 Kan. 64, 558 P.2d 133 (1976), this court reversed the district court's entry of summary judgment against the plaintiff and also concluded that he should have been permitted to amend his petition. Factors mentioned by the court in its consideration of the amendment issue were that "[t]he case was not an old one on the court's docket" and that plaintiff had not examined certain pertinent "records until they were introduced in evidence at the hearing on the motion for summary judgment." 221 Kan. at 66.

In *James v. City of Wichita*, 202 Kan. 222, 447 P.2d 817 (1968), the plaintiff's original petition against the city was defective in that it did not include allegations that she had complied with a statute which required notice to be given to the city before suit was filed. The city conceded that James had satisfied the statutory precondition, 202 Kan. at 225, but she had failed to aver performance of it. The city's opposition to the amendment was on the ground that the limitations period expired between initiation of the suit and James' request for leave to amend. Relation back under K.S.A. 60-215(c) obviated the objection, and there was no prejudice to defendants. Thus, the case was remanded with instructions to permit the amendment. 202 Kan. at 227-28.

In the present case, the district court stated its reason for denying leave to amend. It is not obvious from the circumstances that the district court's discretion was abused, as was obvious in *Schierenberg* and *James*. As discussed above, the defendants contend that they would have been prejudiced by the amendment, but their contention is questionable. On the other hand, it is questionable why Herman's Title VII retaliatory discharge claim was not raised until some 20 months after the petition was filed. In addition, we have affirmed the trial court's granting of summary judgment in favor of the defendants on the discriminatory hostile

work environment claim. "Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only where no reasonable person would take the view adopted by the trial court." *In re Marriage of Soden*, 251 Kan. 225, Syl. ¶9, 834 P.2d 358 (1992). We cannot say that no reasonable person would take the view adopted by the district court. We therefore find no abuse of discretion.

The judgment of the district court is affirmed.

SIX, J., not participating.

PRAGER, C.J. Retired, assigned.