Shirley M. BYLE, Plaintiff,

v.

ANACOMP, INC., Defendant.

No. 93–2268–JWL.

United States District Court, D. Kansas.

May 6, 1994.

Richard E. Armitage, Armitage & Farnum, P.C., Kansas City, MO, Janet Davis Baker, Overland Park, KS, for plaintiff.

Sandra L. Schermerhorn, Spencer, Fane, Britt & Browne, Kansas City, MO, Nancy M. Landis, Brian F. Stayton, Spencer, Fane, Britt & Browne, Overland Park, KS, for defendant.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

## I. INTRODUCTION

This matter is currently before the court on the motion of defendant, Anacomp, Inc. ("Anacomp"), for summary judgment (Doc. # 33) against plaintiff Shirley M. Byle. This is an employment action in which plaintiff alleges she was discharged from her employment in retaliation for "whistleblowing." She alleges she was terminated because she reported an improper billing to a customer and a submission by a supervisor of personal bills for corporate payment. Plaintiff further claims she was subjected to severe and outrageous treatment by her supervisors which constituted an intentional infliction of emotional distress. For the reasons set forth below, defendant's motion for summary judgment (Doc. # 33) is granted in part and denied in part.

## II. FACTUAL BACKGROUND

The following facts are either uncontroverted or viewed in the light most favorable to the plaintiff. Plaintiff was employed from 1981 to 1991 as an administrative assistant and later as an office administrator, by defendant Anacomp, Inc. In September of 1989, Mike Calloway, then plaintiff's supervisor, asked plaintiff to prepare a billing invoice to send to a customer, Truman Medical Center ("TMC"), for equipment that had not actually been sold. Plaintiff has produced evidence indicating that TMC did not authorize or request the equipment and never advised anyone at Anacomp that it would be purchased. The equipment, an expensive computer system, cost $15,869.00.

Plaintiff believed it was unlikely that TMC would buy the equipment because the company was having financial trouble and allegedly told Mr. Calloway she "didn't want any part" in the billing. She was told by Mr. Calloway that the equipment would be sold later, and when plaintiff protested further, Mr. Calloway responded that she should "do it or else." Plaintiff then spoke to Earl Humes, the regional administrator, and Adam Santavicca, the regional vice president, about the billing. Both men approved it.

Plaintiff refused to prepare the billing personally: this was done by the responsible sales representative, Breck Churchill. When plaintiff sent the billing to Anacomp's corporate offices, she placed error flags in the invoice, knowing that doing so would cause the billing to be held up at the corporate offices.

Plaintiff claims the reason for the billing was so that the district office could meet its sales quotas for the fiscal year. Plaintiff claims that as a direct result of the sale, Breck Churchill, a salesperson, not only met his quota, but was paid a commission and qualified to go on an incentive trip known as the "quota club." According to plaintiff, Mr. Calloway, Mr. Santavicca and Mr. Humes also benefitted from the billing in that they would receive financial rewards from the company for meeting their quotas. The billing was later taken off the system and TMC did not pay for the equipment at any time.

Plaintiff contends that after the Anacomp corporate offices were informed of the improper billing Mr. Calloway questioned her loyalty and both he and Mr. Santavicca treated her differently. Mr. Calloway testified that Mr. Santavicca suggested that plaintiff be fired.

In 1990, Mr. Calloway was replaced as plaintiff's supervisor by Gale Hart. In October of 1990, plaintiff confronted Ms. Hart with evidence that she had attempted to be compensated for personal items by declaring personal expenses on Anacomp's general ledger as corporate expenses. Plaintiff reported the activity to the regional office and to Mr. Humes, who suggested she contact Mr. Santavicca. She did as instructed, and, soon thereafter, Mr. Santavicca informed plaintiff that Ms. Hart had been released. Plaintiff claims that, before she was released, Ms. Hart became abusive towards her and had wanted to fire her, but was informed by Mr. Santavicca that she should not do so.

In January of 1991, Johnette Boyle was hired from outside the company to replace Hart as plaintiff's supervisor. Plaintiff contends that Ms. Boyle advised persons in the office that both she and Mr. Santavicca believed that plaintiff made too much money

and fostered a bad attitude among the office employees. In March, plaintiff received a note from Ms. Boyle regarding plaintiff's failure to notify her prior to being absent from work. In May, plaintiff received a six-month performance appraisal from Ms. Boyle, wherein she was rated "minimally acceptable" and was disciplined by being required to take a "decision-making leave day." The evaluation cited a poor attendance record and insubordination, and was based in part upon information received from Mr. Humes. Plaintiff alleges that in a meeting with Ms. Boyle shortly thereafter, Ms. Boyle assured her the appraisal was really the result of poor communication and differing management styles, that there were no serious problems and that the appraisal would not be placed in her personnel file.

On June 5, 1991, plaintiff was discharged by Anacomp for the following reasons: failure to correct poor work habits; a poor attendance record; a negative attitude toward management; inflexibility toward change; and an inability to take orders from superiors. Plaintiff points out that, two months before her discharge, she had been commended by the regional office for her performance. In addition, Ms. Boyle testified in her deposition that although she remembers discussing plaintiff's termination with Mr. Humes and Mr. Santavicca, and that she sought their approval, she cannot now remember why she discharged plaintiff. Various employees testified that plaintiff performed her job adequately.

Plaintiff alleges in this action that she was fired in retaliation for whistle-blowing, both on the improper billing and on Ms. Hart's suspicious expense accounting. Plaintiff also claims that she has suffered intentional infliction of emotional distress due to the treatment she received from her superiors at Anacomp.

### III. SUMMARY JUDGMENT STANDARD

■ When considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the nonmoving party. *Langley v. Adams County, Colorado,* 987 F.2d 1473, 1476 (10th Cir.1993). A moving party who bears the burden of proof at trial is entitled to summary judgment only when the evidence indicates that no genuine issue of material fact exists. Fed.R.Civ.P. 56(c); *Anthony v. United States,* 987 F.2d 670, 672 (10th Cir.1993). If the moving party does not bear the burden of proof at trial, it must show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

■ Once the movant meets these requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). The nonmovant may not merely rest on the pleadings to meet this burden. *Id.* Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. at 2511; *Tersiner v. Union Pacific R.R.,* 740 F.Supp. 1519, 1522–23 (D.Kan. 1990). More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex,* 477 U.S. at 327, 106 S.Ct. at 2555.

■ The burden at the summary judgment stage is similar to the burden of proof at trial. *Stuart v. Beech Aircraft Corp.,* 753 F.Supp. 317, 318 (D.Kan.1990), *aff'd,* 936 F.2d 584 (10th Cir.1991). The court reviews the evidence on summary judgment under the substantive law and based upon the same evidentiary burden that the particular party will face at trial. *Anderson,* 477 U.S. at 254, 106 S.Ct. at 2513. For purposes of this motion, plaintiff has the burden to produce evidence from which a reasonable jury could conclude, by clear and convincing evidence, that plaintiff was retaliated against for whistle-blowing.[1] *See Pilcher v. Bd. of County*

---

1. Under Kansas law, the term "clear and convincing evidence" refers not to a quantum of proof, but rather to the quality of the proof presented. *Stuart,* 753 F.Supp. at 324 (citing

*Comm'rs of Wyandotte County,* 14 Kan. App.2d 206, 214, 787 P.2d 1204, 1210 (1990).

## IV. DISCUSSION

### A. Retaliatory Discharge

■ Kansas has recognized that termination of an employee in retaliation for the good faith reporting of a serious infraction of the law by an employer or co-worker to either company management or law enforcement officials is an actionable tort. *See Palmer v. Brown,* 242 Kan. 893, 900, 752 P.2d 685, 689–90 (1988). In order to sustain a cause of action for retaliatory discharge plaintiff must show that a reasonably prudent person would have concluded that a co-worker was engaged in activities "in violation of rules, regulations, or the law pertaining to public health, safety, or the general welfare"; that Anacomp had knowledge of plaintiff's reporting of the alleged infraction prior to plaintiff's discharge; and plaintiff was discharged in retaliation for making the report. *Id.* at 900, 752 P.2d at 690. In addition, plaintiff must show she reported the infraction out of a good faith concern over the wrongful activity, rather than from a corrupt motive such as malice, jealousy, greed or spite. *Id.*

### 1. "Rules, Regulations, or the Law Pertaining to Public Health, Safety, or the General Welfare"

As to the first element of the *Palmer* test, the court finds that plaintiff has alleged sufficient facts from which a trier of fact could conclude that plaintiff reasonably believed she witnessed a violation of a "rule, regulation, or the law pertaining to public health, safety, or the general welfare." The court recognizes that this case presents an extremely close question as to whether the conduct allegedly witnessed touches the "general welfare." However, after careful consideration of all the facts presented, and a

thorough review of all pertinent case law, the court believes the Kansas Supreme Court would find that the conduct reported by plaintiff, if true, was a violation of laws pertaining to the general welfare, within the meaning of *Palmer.*

■ Plaintiff and defendant have strikingly different interpretations of the facts which form the basis of plaintiff's claim. Defendant contends that it was not unusual, nor was it against company rules and regulations, for Anacomp salespeople to authorize the delivery of equipment to prospective purchasers, bill the purchaser, and record the sale for purposes of meeting quotas, before receiving approval of the customer for the sale. Defendant contends that this was a method by which Anacomp could give customers a "trial run" with the hope that the customer would then be persuaded to buy. If the customer chose not to purchase, all invoices were disregarded and the "sale" was removed from any record for purposes of tracking whether a particular salesperson or an entire district had met its quota. Although the propriety of such a procedure is questionable, that issue is not before the court. It is defendant's position that if the procedure did not even violate internal regulations and company policy, it in no way could have been, or could have reasonably been interpreted by an employee to have been, a violation of a rule, regulation or the law pertaining public health, safety and the general welfare.

Plaintiff argues, on the other hand, that it was not company policy to bill a prospective customer until a sale was certain or, at the very least, likely. She argues that it was common knowledge among employees that TMC would not purchase the expensive computer system and that billing them for it in order to meet a quota was overtly fraudulent. She argues that using the "sale" for purposes

*Newell v. Krause,* 239 Kan. 550, 557, 722 P.2d 530 (1986). Thus, plaintiff must establish her claim of retaliatory discharge by a preponderance of the evidence, but that evidence must be clear and convincing. *Id.* Evidence is clear and convincing if: the witnesses to a fact are found to be credible; the facts are distinctly remembered; details are remembered exactly and in

chronological order; the testimony is clear, direct, and weighty; and the witnesses are not confused as to the facts at issue. *Id.* (citing *Modern Air Conditioning, Inc. v. Cinderella Homes, Inc.,* 226 Kan. 70, 78, 596 P.2d 816 (1979). It is with this standard in mind that the court addresses defendant's motion.

of meeting the quota enabled salespeople and her supervisors to either get additional benefits (incentive trips) or monetary compensation.[2] According to plaintiff, the improper billing amounted to theft or embezzlement of company funds or property and would be considered criminal activity in Kansas and Missouri, the latter being the state in which defendant's office was located. *See* K.S.A. 21–3301, 3701 (Supp.1993); Mo.Rev.Stat. § 570.030 (Supp.1993).

The court finds that plaintiff has presented sufficient facts to create a genuine issue of material fact as to whether her version or the defendant's version of the alleged activities pertinent to this case should prevail. In other words, plaintiff has produced sufficient evidence from which a reasonable jury could conclude, by clear and convincing evidence, that she reasonably believed her co-workers were improperly and unlawfully attempting to steal from Anacomp.

Paul Bean, the manager of computer operations at TMC, testified by affidavit that he did not authorize, nor did he request the purchase of the computer system from Anacomp. Lu Ann Hadlock, an administrative assistant for plaintiff, also testified by affidavit that a sale was not forecast on an official sales report until it was considered definite, or at least 75% definite. She stated that this never occurred with respect to the TMC "sale." She further indicated that all of the staff knew that TMC did not have the money for the purchase and that it was her impression the sale was not a "bona fide" sale. A reasonably prudent person in plaintiff's position could have concluded that her co-workers and supervisors were violating company rules and regulations and were attempting to steal from their employer by falsifying records and misrepresenting whether an actual sale had been effectuated.

Likewise, the court finds sufficient evidence that plaintiff's reporting of Ms. Hart's attempt to obtain reimbursement for personal expenses could reasonably be considered a theft from her employer. Plaintiff testified that she reported that Ms. Hart was seeking payments for personal expenses from Anacomp and a short time thereafter Ms. Hart was fired. Defendant does not contend that seeking payment for personal expenses is not prohibited by company regulations.

The issue thus becomes whether plaintiff's reasonable belief that various employees or supervisors were trying to steal from the company constitutes "activities in violation of rules, regulations, or the law pertaining to public health, safety and the general welfare" within the meaning of *Palmer.* There is no Kansas case addressing this precise issue. Defendant argues that even if plaintiff reasonably believed there was some type of improper activity taking place, it was purely a matter of the internal affairs of Anacomp or was purely a violation of company rules and regulations and this is simply insufficient to bring plaintiff's claim of retaliatory discharge within the ambit of *Palmer.* In support of its position, defendant cites the recent case of *Herman v. Western Financial Corp.,* 254 Kan. 870, 869 P.2d 696 (1994), in which the Kansas Supreme Court held that a violation of internal loan policies, guidelines, or underwriting standards of a savings and loan association were not violations of "rules, regulations or the law pertaining to public health, safety and the general welfare." Defendant contends this case falls squarely within the holding of *Herman,* and, thus, plaintiff's claim must fail. The court is persuaded otherwise.

In *Herman,* plaintiff alleged that she was discharged by Columbia Savings Associa-

---

**2.** Although in her motion papers plaintiff seemed to argue, at least impliedly, that the improper billing constituted "stealing" from TMC, plaintiff indicated otherwise at a hearing on the summary judgment motion on April 25, 1994. Plaintiff conceded that it was not her belief at the time she reported the improper billing that Anacomp would take money from TMC without its consent to purchase. Plaintiff admitted that it was her belief that the improper billing was a theft of company property and that it was both improper and unlawful. Thus, the issues before the court are: (1) whether a reasonably prudent person would have believed certain co-workers were "stealing" from the company; and (2) whether a reasonable belief that an employee is stealing from an employer is a violation of a rule, regulation or the law pertaining to public health, safety or the general welfare.

tions, F.A., for reporting irregularities in the mortgage loan file of an applicant who also happened to be an employee of the savings and loan association. She alleged that the bank improperly issued a purchase money mortgage loan to the employee and his wife, in violation of various company rules and regulations. The court held that even if plaintiff's allegations were true, she could not state a viable claim for retaliatory discharge because the granting of a loan in direct violation of company policy does not constitute an unlawful or improper act which pertains to public health, safety or the general welfare. *Id.* at 882–84, 869 P.2d at 705.

In contrast to *Herman,* the violation reported in this case may reasonably be considered both a violation of company policy and a criminal act under state law, i.e., theft or attempted theft. The court believes that the Kansas Supreme Court would, if faced with the issue, recognize a cause of action for retaliatory discharge where the violation allegedly reported is not only a violation of internal regulations, but rises to the level of criminal theft, a "serious infraction" of the law.

Critical to the court's conclusion is a straightforward reading of the Kansas Supreme Court's rationale for adopting the whistleblowing cause of action as an expansion on earlier prohibitions against terminating an employee contrary to public policy.[3] In *Palmer,* the court stated, "[i]t has long been recognized as public policy to encourage citizens to report crimes ... [I]t is public policy ... everywhere to encourage the disclosure of criminal activity." *Palmer,* 242 Kan. at 899, 752 P.2d at 689. It is the "sound public policy [of Kansas] to encourage those who have knowledge of a crime to come forward and give information to law enforcement officers without fear of disclosure." *Id.* Thus, that court seems to have drawn a line that includes the reporting of serious crimes within the ambit of laws pertaining to the general welfare. Moreover, in the holding itself, the court included the reporting to superiors, as well as to authorities, within the activity protected. *Id.* at 900, 752 P.2d at 689. Plaintiff has produced evidence from which a reasonable trier of fact could conclude that she reasonably believed a serious crime was being committed against her company. The public policy of Kansas, as announced by its highest court, seems to protect plaintiff from discharge in retaliation for reporting such activity.

The court recognizes that the criminal activity of the employee in *Palmer* was not directed at the employer, but rather was committed against a third party, and arguably the general public. However, in light of the breadth of the *Palmer* language the court does not deem this difference controlling. Moreover, *Palmer* specifically approved of cases from other jurisdictions which "have provided common-law 'whistleblower' protection for employees discharged for reporting *illegal activity.*" *Id.* at 900, 752 P.2d at 689 (emphasis added).[4] The

---

3. Kansas follows the general rule of employment-at-will, and in the absence of an agreement to the contrary, employment is terminable at the will of either the employer or the employee. *Johnson v. Nat'l Beef Packing Co.,* 220 Kan. 52, 54, 551 P.2d 779, 781 (1976). An exception to this rule exists, however, if an employee's discharge contravenes public policy. *Brown v. United Methodist Homes for the Aged,* 249 Kan. 124, 135, 815 P.2d 72 (1991). In *Murphy v. City of Topeka,* the Kansas Court of Appeals recognized a cause of action in tort, based on public policy, for wrongful discharge in retaliation for the filing of a workers' compensation claim. 6 Kan.App.2d 488, 495–96, 630 P.2d 186 (1981). The Kansas Supreme Court in *Palmer* extended this public policy exception to include claims of wrongful discharge in retaliation for whistle blowing. In either event, though, the cause of action is rooted in public policy as a limit on the unfettered right to terminate an at-will employee.

4. In particular, the court cited *Palmateer v. Int'l Harvester Co.,* 85 Ill.2d 124, 52 Ill.Dec. 13, 421 N.E.2d 876 (1981), which found that the reporting of a theft of even a hypothetical two dollar screwdriver would invoke whistle-blower protection. The Illinois court indicated that when an employee attempts to report an alleged theft of a co-worker, the problem is no longer solely an internal affair of the company or a "personnel problem." *Id.* at 133, 52 Ill.Dec. at 17, 421 N.E.2d at 880. It stated, "The law is feeble indeed if it permits [an employer] to take matters into its own hands by retaliating against employees who cooperate in enforcing the law." *Id.* at 144, 52 Ill.Dec. at 17, 421 N.E.2d at 880. Although this court recognizes that *Palmer's* citation to this case should not be over-emphasized, it is at least helpful in attempting to divine how the Kansas court would hold if faced with the situation before this court.

court did not distinguish among potential victims, but rather more broadly held that "the termination of an employee in retaliation for the good faith reporting of a serious infraction of such rules, regulations, or the law by a co-worker or an employer to either company management or law enforcement (whistleblowing) is an actionable tort." *Id.* It would be incongruous to provide protection to the plaintiff who reports an employee's theft of the property of a third party, but not to the plaintiff who reports a theft of the property of her own company and then is terminated by those who allegedly committed the theft. The general welfare of the public is served by protecting employees who report alleged illegal activity of fellow employees or superiors without fear of reprisal from those very same employees.[5]

In the same way, the court finds that plaintiff's reporting of Ms. Hart's transgressions was a report of a violation of the law pertaining to the general welfare. A reasonable jury could conclude that plaintiff reasonably perceived Ms. Hart's actions constituted the crime of stealing from Anacomp and that plaintiff, by reporting to her supervisor, was attempting to prevent a theft from occurring.

### 2. Evidence of Retaliation

■ Regarding the other elements set forth in *Palmer*, the court finds that there exists a genuine issue of material fact as to each one, and plaintiff has met her burden of proof sufficiently to resist summary judgment on each issue. As to the second element, knowledge, it is uncontroverted that the defendant and at least some of plaintiff's supervisors had knowledge of plaintiff's reporting of both the improper billing and the improper expense statements prior to her discharge. The third element, whether plaintiff has produced evidence from which a reasonable jury could conclude she was dis-

charged in retaliation for her actions, is a much closer question.

Defendant presents a forceful and persuasive argument that plaintiff has not met her burden of proof on this motion for summary judgment, arguing that plaintiff has not shown a causal connection, or nexus, between her "whistleblowing" and her discharge. Nevertheless, the court must find in favor of plaintiff. Viewing all the evidence in the light most favorable to plaintiff, and drawing all reasonable inferences therefrom, the court is simply unable to conclude that no reasonable jury could find that plaintiff's discharge was in retaliation for her reporting the alleged infractions of her superiors and co-workers.

Defendant argues plaintiff's discharge was not retaliatory because it occurred almost two years after she raised concerns regarding the billing to TMC and nine months after she reported the improper submission of personal expenses for company payment. Additionally, defendant points out that she was fired, not by Mr. Calloway, but by a supervisor who was not an employee of Anacomp at the time of plaintiff's reporting of the activities. Plaintiff argues in response that the time frame is not dispositive, nor is the fact that she was terminated by a relatively new supervisor.

Plaintiff has produced evidence which indicates that Mr. Santavicca suggested that Mr. Calloway terminate plaintiff shortly after her reporting of the improper billing. She suggests that the delay in time was due to a desire on the part of her supervisors to discharge her once they were assured the efficient operation of the office could continue relatively uninterrupted. She asserts that the hiring and training of some new employees provided an opportune time to release her.

**5.** Defendant also cites to *Baker v. Wal–Mart Stores, Inc.,* No. 90–2231, 1991 WL 158895 (D.Kan.1991), which held that a plaintiff who claims to have been wrongfully discharged as a result of reporting company policy violations committed by a fellow employee did not state facts from which a reasonably prudent person could conclude that there was a violation of "rules, regulations or the law pertaining to the public health, safety or the general welfare." 1991 WL 158895, at *3. *Baker* may be distinguished from the instant case on the same basis as *Herman. Baker* did not involve an alleged violation of a company policy which was, at the same time, an alleged violation of criminal law. The rule at issue in *Baker* was a company policy prohibiting the hiring of employees' spouses or girlfriends. *Id.* at *1.

As to the claim that the new supervisor eliminates the plausibility of retaliatory intent, plaintiff responds that, although the direct supervisor may have been replaced during the time between the billing incident and her discharge, the regional administrator and the regional vice president, Mr. Humes and Mr. Santavicca, remained the same. Johnette Boyle, the supervisor who terminated plaintiff, testified in her deposition that she used information supplied by Mr. Humes in submitting the poor performance evaluation which defendant claims is at the heart of her discharge. Ms. Boyle further testified that she would have sought Mr. Humes' and Mr. Santavicca's approval in firing plaintiff. Moreover, when asked why she terminated plaintiff, Ms. Boyle could not recall any specific reason and generally approved of plaintiff's performance.

In addition, plaintiff testified in her deposition that her supervisors' treatment of her changed perceptibly after the billing incident. She has produced evidence that her work was satisfactory and that she received a commendation for outstanding performance from the regional office only two months before her discharge. Other employees testified that she was a good worker and was well-respected. In contrast, defendant's reasons for plaintiff's termination are at best neutral, and arguably give rise to an inference that they are pretextual. Phrases such as "a negative attitude toward management," "inflexibility toward change" and "inability to take orders from superiors" arguably evidence intolerance of plaintiff's willingness to report infractions by her superiors.

■ Finally, the court finds that genuine issues of material fact exist as to whether plaintiff reported the alleged activity in good faith and absent a corrupt motive. Defendant contends plaintiff reported the various activities out of concern that they would negatively impact the "days sales outstanding," which indicates the number of days an account is past due, for which plaintiff was responsible. The court finds, however, that plaintiff has produced evidence that she had a good faith belief she was reporting illegal activity such that this court is precluded from finding an improper motive as a matter of law.

Thus, the court finds that genuine issues of material fact exist which prevent it from finding, as a matter of law, that the defendant did not wrongfully retaliate against plaintiff for "whistleblowing." Defendant's motion for summary judgment on plaintiff's claim of retaliatory discharge is, therefore, denied.

## B. Intentional Infliction of Emotional Distress

The second count of plaintiff's complaint is for intentional infliction of emotional distress. The Kansas Supreme Court set forth the threshold requirements for this tort, which the court must, in the first instance, determine: "(1) Whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery; and (2) whether the emotional distress suffered by plaintiff is in such extreme degree the law must intervene because the distress inflicted is so severe that no reasonable person should be expected to endure it." *Roberts v. Saylor,* 230 Kan. 289, 292–93, 637 P.2d 1175, 1179 (1981). In this case, the court finds that neither of the threshold requirements is met; thus, summary judgment is appropriate on this claim.

■ Regarding the first requirement, defendant's conduct is simply not extreme and outrageous in the legal sense. Kansas courts have recognized that "liability does not arise from mere insults, threats, annoyances, petty expressions, or other trivialities." *Id.* Plaintiff alleges the following facts in support of this requirement: 1) that she felt threatened by Mike Calloway; 2) that Gale Hart yelled at her and on occasion called her a "bitch"; and 3) that Johnette Boyle monitored her comings and goings and evaluated her performance harshly. These facts, taken as true, do not rise to the level of extreme and outrageous conduct. If anything, these complaints fit within the category of "mere insults, threats, annoyances . . . ." The defendant's conduct, even if rude, simply does not "go beyond the bounds of decency" so as to justify a claim of intentional infliction of emo-

tional distress. *See id.* at 293, 637 P.2d at 1179.

■ The second threshold requirement, plaintiff's severe emotional distress, is also not satisfied in this case. The extreme distress necessary for this requirement must be reasonable and justified, and there can be no liability if plaintiff appears to suffer exaggerated and unreasonable emotional distress. *Id.* at 294, 637 P.2d at 1180. Plaintiff has testified that she was an "emotional wreck" at various times during her employment; that she feared for her job; that she sought medical treatment for high blood pressure; that she was unable to work regular business hours during part of her tenure; and that she suffered from sleeplessness. Her symptoms, taken together, do not rise to the level of extreme distress. Except for her high blood pressure, plaintiff does not claim to have sought medical treatment for any of these symptoms. Furthermore, this court finds that, to the extent plaintiff suffered emotional distress, her distress was exaggerated and unreasonable under the circumstances. The conduct that she alleges to have suffered through is not outrageous enough to cause severe emotional distress in a reasonable person. For these reasons, the court grants defendant's motion for summary judgment on plaintiff's claim of intentional infliction of emotional distress.

*V. CONCLUSION*

**IT IS, THEREFORE, BY THE COURT ORDERED** that the motion of defendant, Anacomp, Inc., for summary judgment (Doc. # 33) is granted in part, as to plaintiff's claim for intentional infliction of emotional distress, and denied in part, as to plaintiff's claim for damages for retaliatory discharge.

**IT IS SO ORDERED.**